UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------------- x

CARTER PAGE,

                  Plaintiff,

        - against -

OATH INC., and BROADCASTING
BOARD OF GOVERNORS,

                  Defendants.

------------------------------------------------------- x

:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 17-CV-06990-LGS

## MEMORANDUM OF LAW IN SUPPORT OF MOTION BY
## DEFENDANT OATH INC. TO DISMISS COMPLAINT

James Rosenfeld
Jeremy A. Chase
Abigail B. Everdell
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY  10020-1104
Phone:   (212) 489-8230
Fax:        (212) 489-8340
E-mail:   jamesrosenfeld@dwt.com
          jeremychase@dwt.com
          abigaileverdell@dwt.com

*Attorneys for Defendant Oath Inc.*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................... 1

RELEVANT FACTS ...................................................................................... 3

    A.     The Parties ................................................................................ 3

    B.     The September 23 Article .......................................................... 4

    C.     The Complaint ........................................................................... 5

ARGUMENT ................................................................................................. 6

I.      PLAINTIFF'S LIBEL CLAIM FAILS BECAUSE THE MAJORITY OF THE
       STATEMENTS COMPLAINED OF ARE NOT FALSE AND DEFAMATORY .......... 6

    A.     Many of the Challenged Statements are Not Capable of Defamatory
          Meaning ...................................................................................... 6

    B.     Many of the Challenged Statements are Substantially True .................. 8

II.     PLAINTIFF FAILS TO PLAUSIBLY ALLEGE ACTUAL MALICE ......................... 11

    A.     Plaintiff is a Public Figure, and Was a Public Figure Well Before the
          September 23 Article ............................................................................ 12

    B.     The Complaint Fails to Plead Facts That Would Plausibly Support an
          Actual Malice Finding .......................................................................... 13

          1.     The September 23 Article ....................................................... 14

          2.     The Post-September 23 Articles .............................................. 17

III.    OATH IS IMMUNE FROM DEFAMATION LIABILITY FROM THIRD-
       PARTY "CONTRIBUTOR" CONTENT DISPLAYED ON THE HUFFPOST
       WEBSITE ............................................................................................ 19

    A.     Oath Provides an Interactive Computer Service .................................. 20

    B.     Oath Did Not Create or Develop the Third-Party Content ................... 21

    C.     Plaintiff Seeks to Hold Oath Liable as the Publisher of Third Party
          Content in Violation of Section 230 ...................................................... 23

IV.    CLAIMS ARISING FROM THE PRE-SEPTEMBER 23 ARTICLES ARE
       BARRED BY THE STATUTE OF LIMITATIONS ........................................ 23

V.     PLAINTIFF'S REMAINING CLAIMS ARE DUPLICATIVE AND PATENTLY

FRIVOLOUS ........................................................................................................................ 23

CONCLUSION.................................................................................................................... 25

4841-0966-0497v.7 0092786-000004

# TABLE OF AUTHORITIES

Page(s)

## Cases

*AdvanFort Co. v. Cartner*,
  No. 1:15-cv-220, 2015 WL 12516240 (E.D. Va. Oct. 30, 2015) ...........................................19

*Almeida v. Amazon.com, Inc.*,
  456 F.3d 1316 (11th Cir. 2006) ........................................................................................19

*Armstrong v. Simon & Schuster, Inc.*,
  197 A.D.2d 87, 610 N.Y.S.2d 503 (1st Dep't 1994), *aff'd*, 85 N.Y.2d 373
  (1995)........................................................................................................................9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................................................13

*Batzel v. Smith*,
  333 F.3d 1018 (9th Cir. 2003) .....................................................................................20, 22

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................................................13

*Ben Ezra, Weinstein & Co. v. AOL*,
  206 F.3d 980 (10th Cir. 2000) ..........................................................................................22

*Biro v. Condé Nast*,
  807 F.3d 541 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2015 (2016) ..................................14, 15

*Biro v. Condé Nast*,
  883 F. Supp. 2d 441 (S.D.N.Y. 2012).....................................................................................7

*Biro v. Condé Nast*,
  963 F. Supp. 2d 255 (S.D.N.Y. 2013)....................................................................................12

*Blumenthal v. Drudge*,
  992 F. Supp. 44 (D.D.C. 1998) ......................................................................................20, 22

*Boley v. Atl. Monthly Grp.*,
  950 F. Supp. 2d 249 (D.D.C. 2013) ...................................................................................18

*Bosco v. Curtin*,
  291 A.D.2d 424, 737 N.Y.S.2d 534 (2d Dep't 2004) ..............................................................7

*Brian v. Richardson*,
  87 N.Y.2d 46, 637 N.Y.S.2d 347 (1995) ...............................................................................8

*Cabello-Rondón v. Dow Jones & Co.*,
No. 16-CV-3346 (KBF), 2017 WL 3531551 (S.D.N.Y. Aug. 16, 2017) ...............................16

*Carafano v. Metrosplash, Inc.*,
339 F.3d 1119 (9th Cir. 2003) ..................................................................................................20

*Carvel Corp. v. Noonan*,
3 N.Y.3d 182 (2004) .................................................................................................................25

*Celle v. Filipino Reporter Enters. Inc.*,
209 F.3d 163 (2d Cir. 2000)......................................................................................................12

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002)........................................................................................................3

*Christopher Lisa Matthew Policano, Inc. v. N. Am. Precis Syn., Inc.*,
129 A.D.2d 488, 514 N.Y.S.2d 239 (1st Dep't 1987) ................................................................7

*Church of Scientology Int'l v. Behar*,
238 F.3d 168 (2d Cir. 2001)........................................................................................................6

*Church of Scientology Int'l v. Time Warner, Inc.*,
903 F. Supp. 637 (S.D.N.Y. 1995)...........................................................................................18

*CIT Grp./Commercial Servs., Inc. v. Prisco*,
640 F. Supp. 2d 401 (S.D.N.Y. 2009).........................................................................................6

*Cohn v. Nat'l Broad. Co.*,
50 N.Y.2d 885, 430 N.Y.S.2d 265 (1980) .........................................................................7, 8, 11

*Collins v. Purdue Univ.*,
703 F. Supp. 2d 862 (N.D. Ind. 2010) ......................................................................................21

*Contemporary Mission, Inc. v. N.Y. Times Co.*,
842 F.2d 612 (2d Cir. 1988)......................................................................................................13

*Croton Watch Co., Inc. v. Nat'l Jeweler Magazine, Inc.*,
No. 06-cv-662 (GBD), 2006 WL2254818 (S.D.N.Y. Aug. 7, 2006) ......................................25

*Dillon v. City of N.Y.*,
261 A.D.2d 34, 704 N.Y.S.2d 1 (1st Dep't 1999) .....................................................................7

*Doe v. MySpace, Inc.*,
528 F.3d 413 (5th Cir. 2008) ....................................................................................................20

*Dongguk Univ. v. Yale Univ.*,
734 F.3d 113 (2d Cir. 2013).......................................................................................................18

*Dowbenko v. Google Inc.*,
   582 F. App'x 801 (11th Cir. 2014) ........................................................22

*Dworkin v. Hustler Magazine, Inc.*,
   668 F. Supp. 1408 (C.D. Cal. 1987), *aff'd*, 867 F.2d 1188 (9th Cir. 1989)............24

*Field v. Grant*,
   30 Misc. 3d 1217(A), 920 N.Y.S.2d 240 (Sup. Ct. Nassau Cty. 2010) ....................7

*Fulani v. N.Y. Times Co.*,
   260 A.D.2d 215, 686 N.Y.S.2d 703 (1st Dep't 1999) ............................................8

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974)............................................................................12, 17

*Gibson v. Craigslist, Inc.*,
   No. 08 Civ. 7735, 2009 WL 1704355 (S.D.N.Y. June 15, 2009)....................19, 20

*Goldreyer, Ltd. v. Van de Wetering*,
   217 A.D.2d 434, 630 N.Y.S.2d 18 (1st Dep't 1995) ................................................8

*Golub v. Enquirer/Star Grp., Inc.*,
   89 N.Y.2d 1074 (1997) ............................................................................6

*Guccione v. Hustler Magazine, Inc.*,
   800 F.2d 298 (2d Cir. 1986)....................................................................8

*Harris v. Mills*,
   572 F.3d 66 (2d Cir. 2009)......................................................................6

*Henderson v. Times Mirror Co.*,
   669 F. Supp. 356 (D. Colo. 1987), *aff'd*, 876 F.2d 108 (10th Cir. 1989) ................8

*Hengjun Chao v. Mount Sinai Hosp.*,
   476 F. App'x 892 (2d Cir. 2012) ............................................................24

*Herbert v. Lando*,
   781 F.2d 298 (2d Cir. 1986)....................................................................16

*Houston v. N.Y. Post Co.*,
   No. 93 CIV. 4408 (KTD), 1997 WL 10034 (S.D.N.Y. Jan. 10, 1997)....................15

*Immuno AG v. Moor-Jankowski*,
   145 A.D.2d 114, 537 N.Y.S.2d 129, *aff'd*, 74 N.Y.2d 548 (1989), *vacated*,
   497 U.S. 1021 (1990), *aff'd*, 77 N.Y.2d 235 (1991)............................................17

*In re Terrorist Attacks on September 11, 2001*,
   714 F.3d 118 (2d Cir. 2013)....................................................................25

v

*Jacobs v. Continuum Health Partners, Inc.*,
   7 A.D.3d 312, 776 N.Y.S.2d 279 (1st Dep't 2004) .............................................25

*James v. Gannet Co.*,
   40 N.Y.2d 415, 386 N.Y.S.2d 871 (1976) ...........................................................12

*Jankovic v. Int'l Crisis Grp.*,
   822 F.3d 576 (D.C. Cir. 2016), *cert. denied*, 137 S. Ct. 1434 (2017) ....................13

*Johnson v. Arden*,
   614 F.3d 785 (8th Cir. 2010) ..............................................................................20

*Jones v. Dirty World Entm't Recordings, LLC*,
   755 F.3d 398 (6th Cir. 2014) ..................................................................20, 21, 22

*Kimzey v. Yelp! Inc.*,
   836 F.3d 1263 (9th Cir. 2016) .............................................................................20

*Krepps v. Reiner*,
   588 F. Supp. 2d 471 (S.D.N.Y. 2008), *aff'd*, 377 F. App'x 65 (2d Cir. 2010).........7

*Kurian v. Forest Hills Hosp.*,
   962 F. Supp. 2d 460 (E.D.N.Y. 2013) ...................................................................6

*Love v. William Morrow & Co.*,
   193 A.D.2d 586, 597 N.Y.S.2d 424 (2d Dep't 1993) .............................................9

*M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*,
   809 F. Supp. 2d 1041 (E.D. Mo. 2011)................................................................19

*Masson v. New Yorker Magazine, Inc.*,
   501 U.S. 496 (1991).............................................................................................8

*McFarlane v. Sheridan Square Press, Inc.*,
   91 F.3d 1501 (D.C. Cir. 1996) ............................................................................16

*Michtavi v. N.Y. Daily News*,
   No. 06 Civ. 8260, 2008 WL 754694 (S.D.N.Y. Mar. 12, 2008) ......................7, 11

*N.Y. Times v. Sullivan*,
   376 U.S. 254 (1964)...................................................................................2, 12, 13

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*,
   87 N.Y.2d 614 (1996) .........................................................................................24

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
   591 F.3d 250 (4th Cir. 2009) ..............................................................................19

*Palin v. N.Y. Times Co.*,
  --- F. Supp. 3d ---, 2017 WL 3712177 (S.D.N.Y. Aug. 29, 2017) ..........................................18

*Parisi v. Sinclair*,
  774 F. Supp. 2d 310 (D.D.C. 2011) ...................................................................................20

*Parker v. Google, Inc.*,
  422 F. Supp. 2d 492 (E.D. Pa. 2006) ................................................................................20

*Polish Am. Immigration Relief Comm., Inc. v. Relax*,
  189 A.D.2d 370, 596 N.Y.S.2d 756 (1993) ......................................................................17

*Printers II, Inc. v. Prof'ls Publ'g, Inc.*,
  784 F.2d 141 (2d Cir. 1986)................................................................................................8

*Rappaport v. VV Publ'g Corp.*, 163 Misc.2d 1, 618 N.Y.S.2d 746 (Sup. Ct. N.Y.
  Cty. 1994) ...........................................................................................................................8

*Rebozo v. Wash. Post Co.*,
  637 F.2d 375 (5th Cir. 1981) ...........................................................................................12

*Restis v. Am. Coal. Against Nuclear Iran, Inc.*,
  53 F. Supp. 3d 705 (S.D.N.Y. 2014).................................................................................24

*Rinaldi v. Holt, Rinehart & Winston, Inc.*,
  42 N.Y.2d 369, 397 N.Y.S.2d 943 (1977) ........................................................................8

*Saunders v. Taylor*,
  6 Misc. 3d 1015(A), 800 N.Y.S.2d 356 (Sup. Ct. N.Y. Cty. 2003).........................................7

*Segall v. Sanders*,
  129 A.D.3d 819, 11 N.Y.S.3d 235 (2d Dep't 2015) ..........................................................7

*Serratore v. Am. Port Servs., Inc.*,
  293 A.D.2d 464, 739 N.Y.S.2d 452 (2d Dep't 2002) .............................................................7

*Stepanov v. Dow Jones & Co.*,
  120 A.D.3d 28, 987 N.Y.S.2d 37 (1st Dep't 2014) ..........................................................11

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
  864 F.3d 236 (2d Cir. 2017)................................................................................................9

*Tavoulareas v. Piro*,
  817 F.2d 762 (D.C. Cir. 1987), *cert denied*, 484 U.S. 870 (1987) ........................................18

*Universal Comm'n Sys., Inc. v. Lycos, Inc.*,
  478 F.3d 413 (1st Cir. 2007)........................................................................................19, 20

4841-0966-0497v.7 0092786-000004

*Von Gerichten v. Long Island Advance,*
    202 A.D.2d 495, 609 N.Y.S.2d 246 (2d Dep't 1994) .............................................................9

*Zeran v. Am. Online, Inc.,*
    129 F.3d 327 (4th Cir. 1997) ...............................................................19, 20, 22, 23

**Statutes**

18 U.S.C. § 2331 ..................................................................................................................25

18 U.S.C. § 2333 ..................................................................................................................25

47 U.S.C. § 230 ....................................................................................................... *passim*

New York Civil Rights Law § 74 .........................................................................................11

**Rules**

Fed. R. Civ. P. 12(b)(6) .........................................................................................................1

N.Y. C.P.L.R. 215(3) ...........................................................................................................23

**Constitutional Provisions**

United States Constitution, First Amendment .......................................................................1

Defendant Oath Inc. ("Oath") respectfully submits this Memorandum of Law in Support of its Motion to Dismiss the Complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

Since President Trump was elected in November 2016, the United States intelligence community has concluded that Russia interfered in the election, both houses of Congress have initiated investigations into that interference, and Special Counsel Robert Mueller has begun an investigation into links between the Russian government and the Trump campaign.  Plaintiff Dr. Carter Page brings this lawsuit in response to news coverage and commentary about his central role in that controversy, claiming that statements by Oath publications defamed him and otherwise violated his rights.  Yet while that coverage was extensive, thorough, and at times harsh, it was well within the bounds of the First Amendment.  Nowhere in Plaintiff's copious pleadings does he state a claim against Oath, for defamation or otherwise.

Dr. Page has been a prominent and controversial figure in the unfolding story of Russian meddling in the U.S. presidential election.  President Trump appointed Dr. Page as one of five foreign policy advisers to his campaign on March 21, 2016.  Dr. Page was an adviser to and investor in state-owned Russian oil company Gazprom before he joined the Trump team.  He published articles and gave speeches, both before and after he became an advisor, in which he openly criticized U.S. sanctions against Russia, and praised Russian President Vladimir Putin. Most notably, in July 2016, just before the Republican National Convention, Dr. Page traveled to Moscow to give a lecture at the New Economic School where he criticized U.S. policy in Russia.

Against this backdrop, when, in August 2016, Senate Minority Leader Harry Reid publicly demanded an investigation of reported meetings between Dr. Page and "high-ranking sanctioned individuals" in Moscow, the news media, including Michael Isikoff of Yahoo News,

paid close attention.  Through his reporting, Mr. Isikoff confirmed with both a senior law enforcement official and a senior legislative official, that as of September 23, the U.S. government had indeed initiated such an investigation.  Mr. Isikoff reached out to Dr. Page for comment on the details of his report on multiple occasions, but received no response.  On September 23, 2016, Yahoo published Mr. Isikoff's report, "U.S. intel officials probe ties between Trump adviser and Kremlin," and, over the next nine months, nearly every major news organization, including *The New York Times*, *Washington Post*, and others (including Oath publications and independent contributors to HuffPost), published reports concerning Dr. Page, the investigation, and his ties to the Trump-Russia allegations.  Indeed, Dr. Page has repeatedly confirmed the existence of the investigation.

The integrity of American elections is an issue of the utmost national importance, which mandates adherence to our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."  *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964).  Oath and its subsidiary companies reported and commented extensively on these matters.  Dr. Page, however, characterizes their role differently.  He alleges that Oath, the newly-formed parent company of Yahoo, HuffPost, and others, systematically sought to defame him in service of the Hillary Clinton campaign.  On September 14, 2017, he filed a Complaint asserting that Mr. Isikoff's September 23 Article and other reports on both Yahoo and HuffPost were false and defamatory, constituted terrorism, and tortiously interfered with his business relationships.

The Complaint should be dismissed in its entirety.  ***First***, the Complaint cannot adequately plead the elements of defamation with regard to the majority of the statements at issue, because the Court can hold, based solely on the pleadings and exhibits, that most of those statements are substantially true and/or not susceptible to a defamatory meaning.  (*See* **Section I**,

*infra.*)  ***Second***, the Complaint fails to plausibly allege that *any* of the statements at issue were published with actual malice, as required for a public figure to state a claim for defamation.  (*See* **Section II**, *infra*.)  ***Third***, at least fourteen of the publications complained of cannot form the basis for any defamation claim against Oath because such a claim is barred by either Section 230 of the Communications Decency Act (*see* **Section III**, *infra*) or the relevant statute of limitations (*see* **Section IV**, *infra*).  And ***finally***, Counts 2 and 4 of the Complaint, for "Acts of Terrorism" and tortious interference, are transparent and impermissible attempts to recast Plaintiff's libel claim (Count 1) as other torts to avoid more stringent pleading standards and, in any event, they fail to state a claim.  (*See* **Section V**, *infra*.)

Because Plaintiff's claims have no basis in law and fail to state a claim for relief that is plausible on its face, the Court should dismiss the Complaint in its entirety with prejudice.

## RELEVANT FACTS

### A.   The Parties

Plaintiff Dr. Carter Page is the Managing Partner of Global Energy Capital, LLC, which specializes in investment and advising in the energy sector in emerging markets, including Russia.  Compl. ¶¶ 8, 179, 181.  On March 21, 2016 – six months before the first article at issue was published – Plaintiff was named by then-candidate Donald Trump in an interview with the *Washington Post* as one of only five members of his newly announced "foreign policy team."[1] Soon thereafter, Plaintiff gave a two-hour interview to *Bloomberg*, resulting in an article

---

[1] *See* Compl. Ex. 1, at 2-3 (linking to Post Opinions Staff, *A transcript of Donald Trump's meeting with The Washington Post editorial board*, Wash. Post (Mar. 21, 2016), https://www.washingtonpost.com/blogs/post-partisan/wp/2016/03/21/a-transcript-of-donald-trumps-meeting-with-the-washington-post-editorial-board/?utm_term=.a7b86fdc7173); *see also* Compl. ¶ 27 (admitting that Plaintiff "volunteered" as an "advisor" to the Trump campaign).  While courts generally may not consider material outside the complaint on a motion to dismiss, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (internal quotation marks and citations omitted).  In adjudicating dismissal motions, courts also may rely on a document or other piece of evidence where the complaint "relies heavily upon its terms and effect" rendering it "integral to the complaint."  *Id.* (internal quotation marks and citation omitted).

detailing his extensive financial ties to the Russian energy company Gazprom[2] – ties he did not

deny having until he sold his shares in the company in August 2016.  *See id.* Ex. 9.  Fueled by

records of Plaintiff's numerous statements critical of U.S. policy relating to Russia and

sympathetic to Vladimir Putin,[3] news coverage of Trump's new Russia-connected foreign policy

advisor followed in force.[4]

Defendant Oath is a digital media company of more than 50 media and technology

brands, including, among others, HuffPost, Yahoo, Tumblr, Engadget, and AOL.  *Id.* ¶ 9.  Oath,

a subsidiary of Verizon Communications Inc. ("Verizon"), was launched on June 13, 2017 upon

the completion of Verizon's acquisition of all Yahoo assets from Yahoo Holdings, Inc.  *Id.*  Prior

to June 13, 2017, Yahoo and HuffPost were unaffiliated.  *Id.* ¶ 6.  While both Yahoo and

HuffPost are news organizations that publish original news reporting, HuffPost is also an

Interactive Computer Service Provider, meaning that it offers a platform for third-party

contributors to submit content of their own creation.  *Id.* ¶ 126; Ex. 29.  Eleven of the articles

that form the basis of Plaintiff's Complaint were written and provided to HuffPost by various

"contributors."  *Id.* ¶¶ 82, 109-116, 119.

### B.      The September 23 Article

On September 23, 2016, Yahoo published an Article written by Michael Isikoff, the Chief

Investigative Correspondent of Yahoo News, titled "U.S. intel officials probe ties between

Trump adviser and Kremlin" (the "September 23 Article").  Compl. ¶¶ 10, 37, Ex. 1.  The

September 23 Article detailed how U.S. intelligence officials had briefed senior members of

---

[2] Compl. Ex. 1 at 4; Compl. ¶ 49 n.32 (Washington Post article linking to Zachary Mider, *Trump's New Russia Advisor Has Deep Ties to Kremlin's Gazprom*, BLOOMBERG (Mar. 30, 2016), https://www.bloomberg.com/news/articles/2016-03-30/trump-russia-adviser-carter-page-interview).

[3] *See*, *e.g.*, Compl. ¶¶ 43, 60; Compl. Ex. 13.

[4] *See*, *e.g.*, Compl. ¶ 49 n.32.

Congress, including Senate Minority Leader Harry Reid, about suspected efforts by Moscow to influence the presidential election. *Id.* Ex. 1. Following one of those briefings, according to the September 23 Article, Senator Reid sent a letter to FBI Director James Comey calling for an investigation of, among other things, reported meetings between Dr. Page and "high-ranking sanctioned individuals" in Moscow. *Id.* The Article continues that, although Dr. Page previously declined to tell *Reuters* whether he met with Russian officials during his July 2016 trip to Moscow, U.S. officials received intelligence reports that the "high-ranking sanctioned individuals" he had allegedly met with were Igor Sechin (former deputy Prime Minister and executive chairman of Rosneft, Russia's leading oil company) and Igor Diveykin (a Putin aide). *Id.* Both a congressional source and a senior U.S. law enforcement official referenced in the Article observed that the reports about Dr. Page's purported talks with senior Russian officials were being monitored and investigated. *Id.* Finally, the Article discussed Dr. Page's role in the campaign, and how his role became murkier in August 2016, at which point the Trump campaign distanced itself from him, ultimately claiming he "has no role." *Id.*

### C.     The Complaint

On September 14, 2017, Plaintiff filed his Complaint in the above-captioned lawsuit. The Complaint alleges one count of defamation against Oath. At the heart of Plaintiff's defamation claim is the statement from the September 23 Article that U.S. officials have received intelligence reports providing that Plaintiff met with Sechin and Diveykin while in Moscow in July 2016. Plaintiff also complains that other articles that have appeared on Yahoo and HuffPost since June 2016 contain false and defamatory statements about him. Compl. ¶ 1. Plaintiff also asserts tag-along claims of "Acts of Terrorism" and tortious interference against Oath.

# ARGUMENT[5]

## I.     PLAINTIFF'S LIBEL CLAIM FAILS BECAUSE THE MAJORITY OF THE STATEMENTS COMPLAINED OF ARE NOT FALSE AND DEFAMATORY

Plaintiff fails to plead the necessary elements of a defamation claim.  To prevail on such a claim in New York, a public figure like Plaintiff[6] "must show that the statements it complain[ed] of were (1) of and concerning [plaintiff], (2) likely to be understood as defamatory by the ordinary person, (3) false, and (4) published with actual malice, that is, either knowledge of falsity or reckless disregard of the truth."  *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001).  Here, each of the numerous statements Plaintiff challenges fails on one or more of these grounds.[7]

### A.     Many of the Challenged Statements are Not Capable of Defamatory Meaning

A statement is defamatory only "if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community."  *Golub v. Enquirer/Star Grp., Inc.*, 89 N.Y.2d 1074, 1076 (1997) (citation and internal quotation marks omitted).  Whether a statement is reasonably susceptible of a

---

[5] Plaintiff purports to represent himself pro se in this matter.  While courts generally construe pro se pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), that special solicitude is not warranted here, as Plaintiff has publicly admitted that he has benefitted from consultation with attorneys in this lawsuit – and that consultation is apparent on the face of his pleadings.  *All In with Chris Hayes*, MSNBC (aired Oct. 30, 2017) *available at* http://www.msnbc.com/all-in/watch/carter-page-reacts-to-indictments-papadopoulos-plea-1084943939800.  At the 6:38 mark of the interview, Chris Hayes asked the Plaintiff, "Do you have legal representation?" to which the Plaintiff responded, "I have some people that are helping me. My main lawsuit…."  Hayes asked again, "But do you have an attorney?" to which Plaintiff responded, "I have…some informal advisers, and a formal adviser…."  *CIT Grp./Commercial Servs., Inc. v. Prisco*, 640 F. Supp. 2d 401, 407 (S.D.N.Y. 2009) (it would be "fundamentally unfair" for a pro se litigant to have the benefit of liberal pleadings standards "when he had the assistance of counsel"); *Kurian v. Forest Hills Hosp.*, 962 F. Supp. 2d 460, 467 (E.D.N.Y. 2013) (holding that since "it appears [Plaintiff] was assisted in drafting these submissions by ... a practicing attorney," the court would "in the interest of fairness … decline[] to apply the liberal pleading standard while considering the Plaintiff's Amended Complaint").

[6] *See* Section II.A. *infra.*

[7] With regard to each of the statements at issue that are not barred from suit by the applicable one-year statute of limitations or Section 230 of the Communications Decency Act, 47 U.S.C. § 230 (*see* Sections III and IV, *infra*), all are either substantially true, *see* Compl. ¶¶ 39, 40, 41, 44, 49, 51, 94, 108, 117, 118, and/or are not capable of defamatory meaning.  *See* Compl. ¶¶ 7, 42, 44, 49, 65, 108.  Plaintiff has also failed to allege actual malice with respect to any of Oath's statements.

defamatory meaning is a question of law for the Court to decide on a threshold motion to dismiss. *Dillon v. City of N.Y.*, 261 A.D.2d 34, 39, 704 N.Y.S.2d 1, 6 (1st Dep't 1999).[8]

Even assuming falsity for purposes of this motion, the challenged statements in the various articles that a particular lecture Dr. Page gave at the New Economic School in July 2016 was a "commencement address" instead of an "academic lecture" (Compl. ¶¶ 44, 47); that Trump aide Hope Hicks described him as an "informal foreign advisor" instead of an "informal foreign policy adviser"[9] (*id*. ¶¶ 49, 108); and that Dr. Page is "one of Donald Trump's main sources of information on foreign affairs" (*id*. ¶ 100), are simply not capable of a defamatory meaning – and "courts will not strain to find a defamatory meaning where none exists." *Cohn v. Nat'l Broad. Co.*, 50 N.Y.2d 885, 887, 430 N.Y.S.2d 265, 266 (1980) (citation omitted).

Moreover, Dr. Page challenges various statements in the articles following Mr. Isikoff's article that plainly are not defamatory statements of fact, but rather are precisely the type of "loose, figurative or hyperbolic" statements that New York courts have repeatedly held cannot give rise to a libel claim.[10] *Dillon*, 261 A.D.2d at 38, 704 N.Y.S.2d at 5; *see also Segall v. Sanders*, 129 A.D.3d 819, 820, 11 N.Y.S.3d 235, 236 (2d Dep't 2015) (mere "rhetorical hyperbole" is not actionable); *see also*, *e.g.*, *Field v. Grant*, 30 Misc. 3d 1217(A), 920 N.Y.S.2d 240 (Sup. Ct. Nassau Cty. 2010) (calling someone "dumb" is nonactionable opinion); *Saunders*

---

[8] Courts in New York routinely grant pre-answer motions to dismiss libel claims on this ground.  *See*, *e.g.*, *Biro v. Condé Nast*, 883 F. Supp. 2d 441, 456-58 (S.D.N.Y. 2012); *Krepps v. Reiner*, 588 F. Supp. 2d 471, 483-84 (S.D.N.Y. 2008), *aff'd*, 377 F. App'x 65 (2d Cir. 2010); *Michtavi v. N.Y. Daily News*, No. 06 Civ. 8260, 2008 WL 754694, at *2 (S.D.N.Y. Mar. 12, 2008); *Bosco v. Curtin*, 291 A.D.2d 424, 424, 737 N.Y.S.2d 534 (2d Dep't 2004); *Serratore v. Am. Port Servs., Inc.*, 293 A.D.2d 464, 465, 739 N.Y.S.2d 452, 453 (2d Dep't 2002); *Christopher Lisa Matthew Policano, Inc. v. N. Am. Precis Syn., Inc.*, 129 A.D.2d 488, 489, 514 N.Y.S.2d 239, 241 (1st Dep't 1987).

[9] In the first paragraph of that same article, Dr. Page <u>is</u> described as a "foreign policy advisor."  *See* Compl. Ex. 1.

[10] Compl. ¶ 110 (calling Page "tawdry"); ¶ 111 (containing headline "All the President's traitors"); ¶ 113 (describing Page as "infamous"); ¶ 114 (calling Page a "sycophantic enabler"); ¶ 115 (calling Page "inexplicably stupid"); ¶ 116 (calling Page "sleazy"); ¶ 119 (Page's secret service code name is "Gomer Pyle, but dumber").  Defamation claims arising out of each of these statements is also barred by Section 230 of the Communications Decency Act.  *See* Section III, *infra*.

*v. Taylor*, 6 Misc. 3d 1015(A), 800 N.Y.S.2d 356 (Sup. Ct. N.Y. Cty. 2003) (calling someone a "stupid bitch" was nonactionable vigorous epithet); *Henderson v. Times Mirror Co.*, 669 F. Supp. 356, 359 (D. Colo. 1987) (term "sleaze-bag" is a vigorous epithet not capable of defamatory meaning), *aff'd*, 876 F.2d 108 (10th Cir. 1989).  When read in the context of the articles in which they appear, none of these challenged statements can form the basis of a libel claim, and accordingly, his claim must be dismissed as it pertains to these statements.[11]

**B.     Many of the Challenged Statements are Substantially True**

Falsity is the "*sine qua non* of a libel claim."  *Brian v. Richardson*, 87 N.Y.2d 46, 51, 637 N.Y.S.2d 347, 350 (1995).  The flip side of that bedrock principle is that substantial truth suffices to defeat such a claim.  *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 397 N.Y.S.2d 943 (1977).  A statement is substantially true if it would not "have a different effect on the mind of the reader than the actual truth, if published."  *Goldreyer, Ltd. v. Van de Wetering*, 217 A.D.2d 434, 436, 630 N.Y.S.2d 18, 22 (1st Dep't 1995).  Minor inaccuracies do not render a statement actionable.  *Fulani v. N.Y. Times Co.*, 260 A.D.2d 215, 216, 686 N.Y.S.2d 703 (1st Dep't 1999); *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301-02 (2d Cir. 1986) (same); *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516-17 (1991) ("The common law of libel … overlooks minor inaccuracies and concentrates upon substantial truth.").  Thus, under New York law, it is not necessary to demonstrate complete accuracy to defeat a charge of libel. It is only necessary that the "gist" or substance of the challenged statement be true.  *Printers II, Inc. v. Prof'ls Publ'g, Inc.*, 784 F.2d 141, 146 (2d Cir. 1986).

---

[11] Page also claims the September 23 Article implies he participated in an alleged conspiracy to commit crimes against the U.S. Democratic Party's leadership and undermine American democracy and the 2016 U.S. elections. Compl. ¶¶ 7, 42, 65**.**  However, at no point does the September 23 Article ever make or imply such a claim.  *See id.* Ex. 1; *Rappaport v. VV Publ'g Corp.*, 163 Misc.2d 1, 5, 618 N.Y.S.2d 746, 748 (Sup. Ct. N.Y. Cty. 1994) ("A defamatory implication must be present in the plain and natural meaning of the words used."); *Cohn*, 50 N.Y.2d at 887, 430 N.Y.S.2d at 266 ("[C]ourts will not strain to find a defamatory meaning where none exists.").

Where, as here, the subject matter is one of public concern (*i.e.*, the integrity of American elections), the plaintiff bears the burden of proving that the statements at issue are substantially false. *Armstrong v. Simon & Schuster, Inc.*, 197 A.D.2d 87, 91, 610 N.Y.S.2d 503, 506 (1st Dep't 1994), *aff'd*, 85 N.Y.2d 373 (1995); *Von Gerichten v. Long Island Advance*, 202 A.D.2d 495, 496, 609 N.Y.S.2d 246, 247 (2d Dep't 1994); *Love v. William Morrow & Co.*, 193 A.D.2d 586, 588, 597 N.Y.S.2d 424, 426 (2d Dep't 1993).  At the pleading stage, that burden is to "plead facts that, if proven, would establish that the defendant's statements were not substantially true." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017).

Here, the Complaint fails to plead facts that if proven would render the statements at issue not substantially true.  Dr. Page's claim focuses primarily on reporting first set out in the September 23 Article – which was then referenced in a string of subsequent complained-of publications.  The September 23 Article reported that U.S. officials received intelligence reports that Dr. Page had met with Sechin and Diveykin – two individuals currently under U.S. sanctions – while in Moscow.  This is substantially true.  The September 23Article did not say or imply that these meetings actually occurred; it reported only that U.S. Officials had received intelligence reports about Dr. Page's alleged meetings.  The Complaint pleads facts that attempt to undermine only the underlying intelligence reports – not the fact that U.S. Officials had obtained those reports.  *See*, *e.g.*, Compl. ¶¶ 2, 27, 32-33, 39-40.  With respect to the actual statement, it is undisputed that U.S. Officials – *i.e.*, Senator Harry Reid, among others – received intelligence reports that described these alleged meetings.  As noted in the September 23 Article, Senator Reid sent a letter to FBI Director James Comey on August 27, 2016 asking the FBI to open an investigation into Dr. Page's purported meeting with "high-ranking sanctioned

individuals while in Moscow in July of 2016."[12]  *See* Compl. Ex. 1 (quoting Letter from Harry

Reid to James Comey (Aug. 27, 2016), https://assets.documentcloud.org/

documents/3035844/Reid-Letter-to-Comey.pdf).  The fact that the September 23 Article reveals

that the "high-ranking sanctioned individuals" were Sechin and Diveykin (even if false) does not

have "a different or worse effect on the mind of a reasonable reader than the truth" – *i.e.* that

officials received reports Dr. Page met with unnamed "high-ranking sanctioned individuals."[13]

Plaintiff has failed to plead any facts that if true would render this statement substantially false.

     In addition to the primary claim, Dr. Page quibbles over minor inaccuracies that do not in

any way alter the gist of the underlying statements.  For example:

- Plaintiff claims a statement in a September 29, 2016 article that Dr. Page is an investor in Gazprom is false because "at the time of the publication," he held no Gazprom shares. Compl. ¶ 82.  However, Page admitted in a September 25, 2016 letter to FBI Director Comey that he owned a stake in Gazprom as recently as a month earlier.  *See* Compl. Ex. 9; *see also* Compl. ¶ 49 n.32.  That he may have divested himself of his shares prior to publication does not alter the gist of the statement.

- Dr. Page claims that he never compared U.S. led sanctions against Russia to the deaths of Michael Brown and Eric Garner.  Compl. ¶¶ 98-99, 106.  However Dr. Page's January 5, 2015 article from the *Global Policy Journal* is written entirely through the lens of this exact comparison.  Compl. Ex. 13.

- Dr. Page says he did not meet with Russian Ambassador Sergey Kislyak at the GOP convention "*just before* Trump operatives stripped the party platform of a pledge to aid Ukraine against Russian aggression."  Compl. ¶ 112 (emphasis added).  Dr. Page, however, admits he met with Kislyak at the GOP convention, disputing only the timing of the meeting.  *Id.*; *see also* Compl. ¶ 122, n.102.  To the extent Dr. Page claims this implies he played a role in altering the Republican Party platform to remove support for Ukraine, the literal truth hardly paints Dr. Page in a better light.  Dr. Page has repeatedly and openly opposed U.S. support for Ukraine, referring to the Russian annexation of Crimea as the "so-called annexation of Crimea," and blaming U.S. foreign policy – rather

---

[12] Although Senator Reid's letter does not refer to Dr. Page by name, the letter referred to a "Trump advisor who has been highly critical of U.S. and European economic sanctions on Russia, and who has conflicts of interest due to investments in Russian energy conglomerate Gazprom" and mentioned that while in Moscow in July 2016 the advisor "gave a speech critical of U.S. policy" – a description that clearly applied only to Dr. Page.  *Id.*

[13] Dr. Page also objects to the statement that his contacts with Russian officials were "being looked at" and were "on [the government's] radar screen."  Compl. ¶¶ 51-52.  However, Dr. Page's request that the FBI end its inquiry (Compl. Ex. 9) establishes that the government *had* been looking into his contacts with Russian officials.

than Russian aggression – for the hostilities in the region.  Compl. Ex. 13; Compl. ¶ 49, n.32 (quoting Zachary Mider, "Trump's New Russia Advisor Has Deep Ties to Kremlin's Gazprom," Bloomberg (Mar. 30, 2016) ("So many people who I know and have worked with have been so adversely affected by the sanctions policy . . . There's a lot of excitement in terms of the possibilities for creating a better situation.").  Thus, even assuming the alleged implication can be drawn from this statement,[14] the statement would not "have a different effect on the mind of the reader from that which the pleaded truth would have produced."

- Dr. Page claims President Trump did not "denounce" ties to Carter Page (Compl. ¶ 117), however President Trump's campaign manager issued just such a denunciation.  *See* Compl. Ex. 8 (Trump Campaign Manager Kellyanne Conway: "Meaning he's not part of our national security or foreign policy briefings that we do now at all, certainly not since I have become campaign manager").[15]

Simply put, Plaintiff's Complaint fails to plead facts that, if true, would render these statements substantially false, and, instead, affirmatively establish these statements are substantially true.[16]

## II.     PLAINTIFF FAILS TO PLAUSIBLY ALLEGE ACTUAL MALICE

To prevail on a defamation claim, a public figure plaintiff must plead and prove by clear and convincing evidence that the defendant published the statements at issue with actual malice –

---

[14] "To survive a motion to dismiss a claim for defamation by implication where the factual statements at issue are substantially true, the plaintiff must make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference."  *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 37-38, 987 N.Y.S.2d 37, 44 (1st Dep't 2014); *Cohn*, 50 N.Y.2d at 887, 430 N.Y.S.2d at 266 ("[C]ourts will not strain to find a defamatory meaning where none exists.").  To the extent any implication could be read into this statement, Dr. Page's claim that it implies he helped draft the 2016 Republican party platform does not carry a defamatory implication as a matter of law.

[15] *See also* Aaron Blake, *Donald Trump's big press conference transcript: Annotating everything the president-elect said*, WASH. POST (Jan. 11, 2017), https://www.washingtonpost.com/news/the-fix/wp/2017/01/11/trump-press-conference-annotating-what-the-president-elect-said-on-russia-the-economy-and-more/?utm_term=.db541d89ba32 (White House Press Secretary Sean Spicer: "Carter Page is an individual who the president-elect does not know and was put on notice months ago by the campaign.").

[16] Dr. Page objects to a statement in a May 22, 2017 article that he is "so far refusing to cooperate" with the Senate Intelligence Committee's requests for documents related to the Russia investigation.  Compl. ¶ 118. However, this statement is absolutely privileged as a fair and true report of a legislative proceeding under New York Civil Rights Law § 74.  On May 5, 2017, the Senate Intelligence Committee issued a press release saying just that: "Three days ago, Carter Page told Fox News he was cooperating with the Committee's investigation into Russian activities surrounding the 2016 Election.  Today we have learned that may not be the case."  Press Release, Senate Select Committee on Intelligence, Chairman Burr and Vice Chairman Warner Statement on Carter Page's Participation in SSCI Investigation (May 5, 2017), available at https://www.intelligence.senate.gov/press/chairman-burr-and-vice-chairman-warner-statement-carter-page%E2%80%99s-participation-ssci.  Substantially accurate reports of government press releases are absolutely privileged under Section 74.  *See*, *e.g.*, *Michtavi v. N.Y. Daily News*, No. 06 Civ. 8260, 2008 WL 754694, at *1-2 (S.D.N.Y. Mar. 12, 2008) (report of Department of Justice press release privileged under Section 74).

4841-0966-0497v.7 0092786-000004

*i.e.*, with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co.*, 376 U.S. at 279-80.  Plaintiff has failed to plead that element here.

### A.      Plaintiff is a Public Figure, and Was a Public Figure Well Before the September 23 Article

Plaintiff – who volunteered as a foreign policy advisor to a presidential candidate, was publicly named by that candidate as an advisor, and courted national press long before any statement at issue was published – is a public figure.  "Those who have voluntarily sought and attained influence or prominence in matters of social concern are generally considered public figures."  *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176-77 (2d Cir. 2000) (affirming district court determination that plaintiff's characterization of himself as a "well known radio commentator" was sufficient for status as public figure); *James v. Gannet Co.*, 40 N.Y.2d 415, 423, 386 N.Y.S.2d 871, 876 (1976) ("The essential element underlying the category of public figures is that the publicized person has taken an affirmative step to attract public attention."). "Where the question whether a plaintiff is a public figure can be determined based upon the pleadings alone, the Court may deem a plaintiff a public figure at the motion to dismiss stage." *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 270 (S.D.N.Y. 2013); *Celle*, 209 F.3d at 176-77.  The Supreme Court has held that public figures must accept the consequences of their involvement in public affairs, and the media "are entitled to act on the assumption that [they] have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344-45 (1974).

In circumstances such as these, where an individual voluntarily advises a president or presidential candidate, is positioned at the center of a controversy of national significance (*i.e.*, Russia's involvement in the 2016 election), and also takes "affirmative steps" to court national press, there is no question he is a public figure.  *See Rebozo v. Wash. Post Co.*, 637 F.2d 375,

379-80 (5th Cir. 1981) (holding that a defamation plaintiff who had informally advised President Nixon during his reelection campaign, had been investigated by a senate committee for his relationship to Nixon and the Watergate controversy, and had been the subject of numerous articles in the national press was a public figure as a matter of law); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 587 (D.C. Cir. 2016) (a plaintiff who "was an outspoken supporter, financial backer, and advisor of" the Prime Minister of Serbia was a public figure), *cert. denied*, 137 S. Ct. 1434 (2017). Because the publications at issue in this litigation all relate to a controversy surrounding Plaintiff's explicitly public role – *i.e.*, whether his relationship with a sanctioned foreign power, Russia, affects his suitability to advise a presidential candidate on foreign policy – Plaintiff is *at minimum* a public figure in the context of this defamation action. *See Contemporary Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 620 (2d Cir. 1988) (holding priests were public figures where publication examined their activities in roles as religious figures).[17]

### B.    The Complaint Fails to Plead Facts That Would Plausibly Support an Actual Malice Finding

As a public figure, Plaintiff must allege that Oath published the statements at issue with actual malice – *i.e.*, "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co.*, 376 U.S. at 279-80. However, conclusory allegations of actual malice are no longer sufficient to survive a motion to dismiss a libel claim. The Second Circuit has affirmed that the "plausibility" pleading standard established in the Supreme Court decisions *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009), applies equally to pleading fault, and thus, to survive a motion to

---

[17] The Complaint itself underscores the basis of the controversy over Plaintiff's involvement in the Trump campaign – namely his close ties to Russia. *See* Compl. ¶ 27 (describing Plaintiff as a "foreign policy scholar"); *id.* ¶ 43 (Plaintiff had "previously given two speeches at New Economic School . . . a private university in Moscow in July 2016"); *id.* ¶ 62 & Ex. 9 (in a letter to James Comey from Plaintiff, defending his 2016 trip to Moscow and admitting he owned shares in Russian oil company Gazprom until August 2016).

dismiss, "a public-figure plaintiff must plead 'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' actual malice." *Biro v. Condé Nast*, 807 F.3d 541, 546 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2015 (2016). Plaintiff has failed to plead plausible grounds to infer actual malice.

### 1.    The September 23 Article

Though Plaintiff attempts through various means to raise an inference of actual malice with regard to the September 23 Article, his claims ultimately fail to meet the required plausibility threshold. Plaintiff does not contend that Mr. Isikoff knew his reporting on Plaintiff was false, but contends he should have known so for several reasons: (1) Mr. Isikoff was familiar with the Clintons and thus should have recognized a smear campaign targeting Plaintiff when he saw it (Compl. ¶¶ 68-72); (2) the facts reported in the September 23 Article were "inherently improbable" (*id*. ¶ 73); and (3) the facts reported came from an unreliable, non-governmental source (*id*. ¶¶ 73, 87). None of these allegations, taken separately or together, put forth a plausible theory that Mr. Isikoff published the September 23 Article with actual malice.

*First*, even accepting, *arguendo*, that the alleged conspiracy targeting Plaintiff is itself plausible, Plaintiff does not plead that Mr. Isikoff's reporting relied on information sourced from the Clintons or any Clinton associates, nor does he plead that Mr. Isikoff had any bias in favor of the Clintons, or any other reason to publish false information for their benefit. To the contrary, Plaintiff admits that Mr. Isikoff is a "seasoned journalist with decades of experience as a reporter" (*id*. ¶ 68), whose investigative reporting on the Clintons in the 1990s was *highly critical* of the Clintons, focusing on their "public wrongs." *Id*. ¶¶ 69-70.

*Second*, Plaintiff's allegation that the reporting in the September 23 Article is "inherently improbable" is entirely conclusory and fails to allege *how* the reporting is "inherently

improbable."  Indeed, there is nothing questionable, or even surprising, about a report that an

energy investor and advisor, foreign policy expert, and shareholder in a Russian oil company (*id.*

¶ 8, Ex. 9), who has been publicly critical of U.S. sanctions against Russia (*id.* Ex. 13; *id.* ¶ 49

n.32[18]), may have met with an energy executive and a government aide to discuss sanctions

while on a business trip to Moscow in the summer of 2016 (*id.* Ex. 9).  *See Houston v. N.Y. Post*

*Co.*, No. 93 CIV. 4408 (KTD), 1997 WL 10034, at *5 (S.D.N.Y. Jan. 10, 1997) (where a tip

from an anonymous source "was corroborated by many subtle details that were consistent with

known aspects of plaintiff's life" and  "by previously reported articles detailing related

circumstances and facts," the tip was not "inherently improbable").

    ***Third***, Plaintiff does not raise an inference of actual malice by claiming that the

information reported by Mr. Isikoff came from an unreliable source.  Compl. ¶ 73.  Even

assuming that Mr. Isikoff did, as alleged in the Complaint, count the author of the dossier of

opposition research published in full by *BuzzFeed* on January 10, 2017 (the "Dossier") as a

source (*id.* ¶ 86) – and assuming that this source's credibility came into question after the

Dossier's publication – Plaintiff has failed to explain why Mr. Isikoff should have considered

otherwise plausible information from this source unreliable *four months before* the Dossier was

published.  *Biro*, 807 F.3d at 546 ("the allegations casting doubt on the reliability of . . .  sources

relate only to events that occurred after publication of the Article and therefore 'cannot be

relevant to the publisher's state of mind [regarding] his alleged malice at the time of

---

[18] The Complaint cites (¶ 49) a *Washington Post* article that describes how, in July 2016 "Page dumbfounded foreign policy experts again by giving another speech harshly critical of U.S. policy . . . in Moscow," and notes that "[o]ther foreign policy experts from both parties say they are distressed with Page for his criticism of sanctions, praise for Putin and his advisers, and his tepid response to what most U.S. policymakers see as Russian aggression." Steven Mufson & Tom Hamburger, *Trump adviser's public comments, ties to Moscow stir unease in both parties*, WASH. POST (Aug. 5, 2016), https://www.washingtonpost.com/business/economy/trump-advisers-public-comments-ties-to-moscow-stir-unease-in-both-parties/2016/08/05/2e8722fa-5815-11e6-9aee-8075993d73a2_story.html?utm_term=.325d61c45d1a

publication.'") (quoting *Herbert v. Lando*, 781 F.2d 298, 306 (2d Cir. 1986)).  The fact that a source may be unreliable in some circumstances does not evidence actual malice where there is no reason to doubt that source's credibility with regard to the information at issue.  *See McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1513 (D.C. Cir. 1996) (reporter did not act with actual malice in publishing the allegations of a source who had a known "propensity to exaggerate and even to lie," where the allegations themselves were otherwise credible).[19]  In any event, the September 23 Article does not rely solely on one source.  *See* Compl. Ex. 1.  And Plaintiff does not contest numerous facts reported in the September 23 Article that would tend to support the reliability of the underlying information:  namely, that U.S. Intelligence officials were looking into allegations that Plaintiff had met with Russian officials in Moscow, that these allegations had been raised in briefings to members of Congress, or that Senator Reid sent a letter to Director Comey asking the FBI to look into the allegations.  *See* Compl. Ex. 1, at 1-2; *see also* Compl. Ex. 9 (Plaintiff writing Director Comey on September 25, 2016 to "request the FBI's prompt end of the reported inquiry regarding my personal trip to Russia in July 2016").

Further, Plaintiff pleads numerous additional facts that *negate*, rather than support an inference of actual malice.  For example, Plaintiff admits the Article's statement that, at the time of his trip to Moscow, he declined to tell a *Reuters* reporter whether he had plans to meet anyone from the Kremlin.  Compl. ¶ 50; *id.* Ex. 1, at 5.[20]  Plaintiff admits that he was "repeatedly asked" by a "diverse array of media outlets" when approached with "these same false allegations" over

---

[19] Nor would it make any difference if, as Plaintiff alleges, the September 23 Article implied the source of the reported information was official, when it in fact came from a non-governmental source.  Where the source of information is cited misleadingly – Oath disputes that the Article is misleading at all – "such a fact merely indicates that [defendant] was less than fully forthcoming regarding the source of the [information]—but not that [defendant] subjectively doubted the [information's] accuracy."  *Cabello-Rondón v. Dow Jones & Co.*, No. 16-CV-3346 (KBF), 2017 WL 3531551, at *10 (S.D.N.Y. Aug. 16, 2017), *appeal docketed*, No. 17-2895 (2d Cir. Sept. 18, 2017).

[20] Compl. Ex. 1 (discussing and linking to Reuters Staff, "Trump adviser, on Moscow visit, dodges questions about U.S. policy on Russia," Reuters (July 7, 2016), http://www.reuters.com/article/us-usa-election-adviser-russia/trump-adviser-on-moscow-visit-dodges-questions-about-u-s-policy-on-russia-idUSKCN0ZN294).

the 60 days leading up to the publication of the September 23 Article and repeatedly refused to comment. *Id.* ¶¶ 32-34.  True to form, Plaintiff admits that he refused to respond to repeated requests for comment from Mr. Isikoff – a fact undermining any allegation of actual malice, or even irresponsible practices.[21]  *See* Compl. ¶¶ 35-37; *Polish Am. Immigration Relief Comm., Inc. v. Relax*, 189 A.D.2d 370, 375, 596 N.Y.S.2d 756, 759 (1993) (by refusing to respond to requests for comment, plaintiff failed to exercise "self-help" – "the first remedy of any victim of defamation" – and therefore could not raise a factual question of actual malice) (quoting *Gertz*, 418 U.S. at 344); *Immuno AG v. Moor-Jankowski*, 145 A.D.2d 114, 137, 537 N.Y.S.2d 129 ("Having entirely failed to pursue this 'first remedy' [of self-help] which was made so extraordinarily available to it" through repeated opportunities to clarify information contained in the publication, "Immuno is not now in a position to complain"), *aff'd*, 74 N.Y.2d 548 (1989), *vacated*, 497 U.S. 1021 (1990), *aff'd*, 77 N.Y.2d 235 (1991).

## 2. The Post-September 23 Articles

Plaintiff alleges no facts that could support an actual malice claim with regard to the post-September 23 Articles either.  Instead he alleges generally that Yahoo's and HuffPost's reporting was part of a deliberate and coordinated misinformation campaign, instigated and executed by "associates of the Clinton Campaign," including AOL Chairman and CEO Tim Armstrong, "via loyal media outlets."  Compl. ¶¶ 32, 61.  Plaintiff claims that Yahoo and HuffPost "recklessly played a prominent role" in the republication of this "chaff" (*i.e.*, politically motivated falsehoods).  *Id.* ¶ 52.  Two flaws with Plaintiff's allegations are fatal to his claims.

***First***, Plaintiff does not allege *who* at Yahoo or HuffPost acted with the requisite actual

---

[21] Although the Court can and should dismiss this case in its entirety on this motion, should this case proceed to discovery, documents will reveal that in addition to leaving two voicemails with Plaintiff, Mr. Isikoff sent Plaintiff two e-mails prior to publication asking Plaintiff to respond to the allegations that Plaintiff now claims are false.  But, Plaintiff did not respond.

malice.  Where a Complaint "fails to identify any individual who possessed the requisite

knowledge and intent and, instead, attributes it to [a publisher] in general," it has failed "on its

face" to allege actual malice.  *Palin v. N.Y. Times Co.*, --- F. Supp. 3d ---, 2017 WL 3712177, at

*7 (S.D.N.Y. Aug. 29, 2017); *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013)

("When there are multiple actors involved in an organizational defendant's publication of a

defamatory statement, the plaintiff must identify the individual responsible for publication of a

statement, and it is that individual the plaintiff must prove acted with actual malice.").[22]

Plaintiff's absurd conspiracy theory puts forth no facts that would support a finding of actual

malice on the part of any article's author or individual publisher.  Rather, it describes all parties

with the exception of the vague "associates of the Clinton campaign" as akin to cogs in a larger

political machine, who were fed information drummed up by the Clinton campaign in the hopes

of undermining Plaintiff.  These allegations are facially insufficient.

  ***Second***, even if Plaintiff had alleged particular individuals had acted with actual malice,

it is not enough to plead actual malice in the abstract – Plaintiff must allege actual malice "*in

conjunction with* [each] false defamatory statement."  *Tavoulareas v. Piro*, 817 F.2d 762, 794

(D.C. Cir. 1987), *cert denied*, 484 U.S. 870 (1987); *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d

249, 262-63 (D.D.C. 2013) (same, dismissing complaint on special motion to dismiss); *see also

Church of Scientology Int'l v. Time Warner, Inc.*, 903 F. Supp. 637, 641 (S.D.N.Y. 1995)

(holding that courts are to consider "each allegedly libelous statement individually to determine

whether a rational finder of fact could find actual malice by clear and convincing evidence").

---

[22] Plaintiff does identify Oath CEO Tim Armstrong as part of the alleged conspiracy, but Plaintiff makes no allegation that Mr. Armstrong played any role in writing or publishing any of the articles at issue.  Further, Mr. Armstrong could not have published any Yahoo article with actual malice since – as the Complaint admits – AOL's parent company Verizon did not acquire Yahoo or create Oath until June 13, 2017, long *after* all but one of the articles was published.   And the only article published after Oath's creation (*see* Compl. ¶ 120) was published by a HuffPost contributor alone, thus Oath cannot be liable for its contents.  *See* Section III *infra*.

Plaintiff makes no such allegations with respect to the post-September 23 Articles.  Because the Complaint says nothing about the state of mind of the actual authors and publishers of the statements at issue, the Complaint falls far short of pleading actual malice with regard to the post-September 23 Articles.

## III.    OATH IS IMMUNE FROM DEFAMATION LIABILITY FROM THIRD-PARTY "CONTRIBUTOR" CONTENT DISPLAYED ON THE HUFFPOST WEBSITE

Plaintiff's claims based on eleven articles from third-party contributors to HuffPost[23] must fail because they are barred by Section 230 of the Communications Decency Act of 1996 ("Section 230"), 47 U.S.C. § 230.  Section 230 states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," 47 U.S.C. § 230(c)(1), and that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section," *id.* § 230(e)(3).  Together, these provisions ensure that interactive computer service providers are immunized from liability for allegedly unlawful or harmful material created and developed by third parties.[24]

Importantly, Section 230 grants "*immunity from suit* rather than a mere defense to liability." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254-55 (4th Cir. 2009).  Courts therefore routinely apply Section 230 in the early stages of litigation—often on a motion to dismiss—because such immunity would be "effectively lost" if defendants were subject to burdensome and costly discovery and protracted litigation.  *Id.* at 254.[25]  In light of the

---

[23] *See* Compl. ¶¶ 82, 109-116, 119, 120.

[24] "[C]ourts that have addressed these issues have generally interpreted Section 230 immunity broadly."  *Universal Comm'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418 (1st Cir. 2007); *see also, e.g.*, *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997).

[25] *See also, e.g.*, *AdvanFort Co. v. Cartner*, No. 1:15-cv-220, 2015 WL 12516240, at *5 (E.D. Va. Oct. 30, 2015); *M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1051 (E.D. Mo. 2011); *Gibson v. Craigslist, Inc.*, No. 08 Civ. 7735, 2009 WL 1704355 (S.D.N.Y. June 15, 2009).

4841-0966-0497v.7 0092786-000004

clear mandate of Section 230 and the important policies animating it,[26] for more than two decades, courts across the country have routinely rejected efforts to hold website operators liable for content developed or created by third parties for publication on those websites.[27]

Section 230 bars suit where (1) the defendant is an interactive computer service provider; (2) the information at issue was provided by another information content provider; and (3) the claim seeks to treat the defendant as a publisher or speaker of that third party content. *Gibson*, 2009 WL 11704355, at *3. All three elements are present here.

### A.  Oath Provides an Interactive Computer Service

HuffPost is an "interactive computer service provider." The CDA defines "interactive computer service" as an "information service . . . that provides or enables computer access by multiple users to a computer server[.]" 47 U.S.C. § 230(f)(2). Courts have "adopt[ed] a relatively expansive definition of 'interactive computer service[.]'" *Carafano*, 339 F. 3d at 1123; *see also Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 501 n.6 (E.D. Pa. 2006) (same). "[T]he most common interactive computer services are websites." *Kimzey v. Yelp! Inc.*, 836 F.3d 1263,

---

[26] Congress enacted Section 230's immunity for interactive computer service providers to accommodate the practical realities of the Internet age. *Id.* § 230(a)(3), (b)(1)–(2). Given the tremendous numbers of users an interactive computer service may have, the "staggering" amount of information that may be communicated, and the difficulties that may be associated with effectively screening it all, *Zeran*, 129 F.3d at 331, Congress' intent for the statute was "to prevent lawsuits from shutting down websites and other services on the Internet," *Batzel v. Smith*, 333 F.3d 1018, 1027-28 (9th Cir. 2003). "The specter of tort liability in an area of such prolific speech would have an obvious chilling effect" because, "[f]aced with potential liability for each message republished . . . , providers might choose to severely restrict the number and type of messages posted." *Zeran*, 129 F.3d at 331; *Parisi v. Sinclair*, 774 F. Supp. 2d 310, 315 (D.D.C. 2011). This would make it impossible for websites providing large amounts of user-generated content — such as Amazon, Facebook, or Yelp — to function as they do now.

[27] *See, e.g., Zeran*, 129 F.3d at 331-32 (AOL immune for publishing false advertisements created by users and failing to remove them promptly even though plaintiff claimed to have received death threats as a result); *Jones v. Dirty World Entm't Recordings, LLC*, 755 F.3d 398, 415-17 (6th Cir. 2014) (suit barred where website published but did not author the statements at issue); *Johnson v. Arden*, 614 F.3d 785, 792 (8th Cir. 2010) ("We conclude that the CDA provides ISPs like [defendant] with federal immunity against state tort defamation actions that would make service providers liable for information originating with third-party users of the service."); *Doe v. MySpace, Inc.*, 528 F.3d 413, 419 (5th Cir. 2008) (no liability arising out of website's publication of user-generated content); *Lycos*, 478 F.3d at 418 (internet message board immune from suit for allegedly false and defamatory postings made by third party subscribers); *Carafano v. Metrosplash, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003) (matchmaking website immune from state law claims stemming from fake profile that led to threats against plaintiff); *Blumenthal v. Drudge*, 992 F. Supp. 44, 51-52 (D.D.C. 1998) (same).

1268 (9th Cir. 2016) (citation omitted).  *See also Collins v. Purdue Univ.*, 703 F. Supp. 2d 862,

878 (N.D. Ind. 2010) ("holding that websites [that publish third party content] are under the

umbrella of protection of" Section 230).  HuffPost hosts a forum for third-party contributors to

post their content to its website.  Oath, the provider of the HuffPost website, therefore also

qualifies as an interactive computer service provider under Section 230.

### B.      Oath Did Not Create or Develop the Third-Party Content

As to the second prong — whether information was provided by another information

content provider— Plaintiff alleges that eleven of the articles at issue were written and provided

to HuffPost by various third-party content "contributors."  Compl. ¶¶ 82, 109-116, 119; *see also*

*id.* ¶ 126 (quoting HuffPost Term of Service regarding third-party content).  These contributors

are the "information content provider[s]" of their respective articles within the meaning of

Section 230.  47 U.S.C. § 230(f)(3) (defining "information content provider" as "any person or

entity that is responsible, in whole or in part, for the creation or development of information

provided through the Internet or any other interactive computer service.").  Plaintiff's claim as it

pertains to these eleven articles arises solely from content which was created and developed by

third-party contributors, not HuffPost.

In determining whether a website operator created or developed the content at issue,

courts examine whether the website operator "materially contributed" to the allegedly unlawful

nature of the content.  *Jones*, 755 F.3d at 410.  But "[a] material contribution to the alleged

illegality of the content does not mean merely taking action that is necessary to the display of

allegedly illegal content."  *Id.* (emphasis added).  "Rather, ***it means being responsible for what***

***makes the displayed content allegedly unlawful.***"  *Id*.  Thus, while a website operator may be

liable for content that *it* personally develops or creates, if it "displays content that is created

entirely by third parties," then the operator is "immune from claims predicated on that content."

*Id.* at 408-09.  Notably, the "exercise of a publisher's traditional editorial functions — such as deciding whether to publish, withdraw, postpone or alter content" — does not void the immunity.  *Dowbenko v. Google Inc.*, 582 F. App'x 801, 805 (11th Cir. 2014) (quoting *Zeran*, 129 F.3d at 330).  To the contrary, that is precisely what Section 230 was designed to protect.  *Id.  See also Batzel*, 333 F.3d at 1031 ("[A] central purpose of the Act was to protect from liability service providers and users who take some affirmative steps to edit the material posted.").  Simply put, Section 230 "forbid[s] the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions."[28]

There is no dispute that the content of these articles, including the information about Plaintiff, was created and developed solely by these third-party contributors without "material contribution" from HuffPost.  Therefore the contributors are the only "information content provider[s]" here.  Plaintiff alleges only that the HuffPost had "final editing responsibility" for "the HuffPost Plaintiff Oeuvre."  Compl. ¶ 24.  But even accepting as true for the purposes of this motion the allegation that HuffPost had "final editing responsibility" for the articles, such allegations about providing the platform for contributors to share their opinions and the exercise of "traditional editorial functions" do not make HuffPost an information content provider.  Plaintiff does not allege that HuffPost had any role in creating the content, nor can he — each author of the subject pieces were, as he alleges, independent "contributors."  These allegations fall far short of "creation or development" of the content by way of "material contribution" to its purported illegality within the meaning of Section 230.  Thus, the second prong of the Section

---

[28] *Ben Ezra, Weinstein & Co. v. AOL*, 206 F.3d 980, 986 (10th Cir. 2000) (AOL immune under Section 230 to defamation claim despite making its own editorial decisions with respect to the third party information it published).  *See also Blumenthal*, 992 F. Supp. at 51-52 (AOL immune from suit despite its "editorial rights with respect to the content provided . . ., including the right to require changes in content and to remove it"); *Jones*, 755 F.3d at 411 ("A website operator who edits user-created content — such as by correcting spelling, removing obscenity or trimming for length — retains his immunity for any illegality in the user-created content, provided the edits are unrelated to the illegality.") (citation omitted).

4841-0966-0497v.7 0092786-000004

230 test for immunity is also met.

**C.     Plaintiff Seeks to Hold Oath Liable as the Publisher of Third Party Content in Violation of Section 230**

Finally, Plaintiff seeks to treat Oath, a website operator, as the publisher or speaker of content provided by third parties.  This is barred by Section 230 because Congress made a "choice . . . not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages."  *Zeran*, 129 F.3d at 330-31.  Here, Plaintiff seeks to do just that.  At bottom, Plaintiff complains about the content of articles *written by third party contributors*.  *See* Compl. ¶¶ 82, 109-116, 119.  And he now seeks to hold the operator of the website where the articles appeared — HuffPost's parent, Oath — responsible for liability claimed to arise from that content.  Section 230 protects Oath from liability as the publisher of these articles, and requires the dismissal of all claims premised on that third-party content.  Oath is thus entitled to the early dismissal of Plaintiff's claims as it relates to the third party contributors' articles.

**IV.     CLAIMS ARISING FROM THE PRE-SEPTEMBER 23 ARTICLES ARE BARRED BY THE STATUTE OF LIMITATIONS**

The statute of limitations for libel actions in New York State is one year from the date of publication.  N.Y. C.P.L.R. 215(3).  Three of the articles that form the basis of Plaintiff's claims were published more than a year before September 14, 2017, the date on which Plaintiff filed suit.  *See* Compl. ¶¶ 98-100, 103, 106.  Any claim premised on these three articles is time-barred.

**V.     PLAINTIFF'S REMAINING CLAIMS ARE DUPLICATIVE AND PATENTLY FRIVOLOUS**

Plaintiff's tag-along tort claims must be dismissed as a matter of law because they are a transparent attempt to evade the stringent pleading standards required for a stating a libel claim.  "New York law considers claims sounding in tort to be defamation claims . . . where those

causes of action seek damages only for injury to reputation, [or] where the entire injury complained of by plaintiff flows from the effect on his reputation." *Hengjun Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (citation omitted).  Accordingly, where a plaintiff attempts to recast a libel claim as another tort, courts in New York routinely dismiss such tag-along claims as duplicative.  *See, e.g.*, *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 727 (S.D.N.Y. 2014) (dismissing tortious interference claim as duplicative of defamation claim).  "Without such a rule, virtually any defective defamation claim, such as the one in this case, could be revived by pleading it as one for intentional infliction of emotional distress [or other torts]; thus, circumventing the restrictions, including those imposed by the Constitution, on defamation claims."  *Dworkin v. Hustler Magazine, Inc.*, 668 F. Supp. 1408, 1420 (C.D. Cal. 1987) (applying New York law), *aff'd*, 867 F.2d 1188 (9th Cir. 1989).  Here, on the face of the Complaint, Plaintiff's claims for tortious interference and "Acts of Terrorism" arise from what Plaintiff alleges are false statements in the articles that damaged his reputation. That is the essence of a libel claim.  But as demonstrated above, Plaintiff does not, and cannot, state an actionable libel claim.  Since Plaintiff cannot avoid dismissal of his defective libel claim by recasting it as another tort, his tag-along claims must be dismissed.

In addition, Plaintiff's tag-along tort claims fail to plead cognizable causes of action. *First*, Plaintiff's claim for "tortious interference" with contract fails because the Complaint does not identify any contract, or claim that any identifiable third party breached a contract with Plaintiff.  *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 620-21 (1996). Likewise, to state a claim for tortious interference with prospective business relations, the plaintiff must allege that the defendant's conduct "either was undertaken for the *sole* purpose of harming plaintiff, or that such conduct was wrongful or improper independent of the interference

allegedly caused thereby." *Jacobs v. Continuum Health Partners, Inc.*, 7 A.D.3d 312, 313, 776 N.Y.S.2d 279, 280 (1st Dep't 2004) (emphasis added). "Conduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other nonbinding economic relations." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004). Here, as a news publisher, Oath obviously had a lawful interest in reporting to the public news concerning suspected ties to a hostile foreign power of a high ranking advisor to a Presidential candidate. Plaintiff does not and cannot plead that Defendant acted for the *sole* purpose of harming him, and accordingly, does not plead a viable claim of tortious interference. *Croton Watch Co., Inc. v. Nat'l Jeweler Magazine, Inc.*, No. 06-cv-662 (GBD), 2006 WL2254818 at *9 (S.D.N.Y. Aug. 7, 2006) (citing cases).

     *Second*, Plaintiff's claim for "Acts of Terrorism" is similarly deficient. To the extent Plaintiff invokes the civil damages provision of the Anti-Terrorism Act of 1996 ("ATA"), 18 U.S.C. § 2333, the ATA only applies to acts that occur primarily outside the United States, 18 U.S.C. § 2331(1)(C), whereas Plaintiff's allegations assert that the purported harm occurred "within the United States." Compl. ¶ 166. Further, the publication of news plainly does not constitute an "act of international terrorism" – *i.e.*, "violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States," a predicate to stating a claim under the ATA. 18 U.S.C. § 2331(1). Finally, Plaintiff fails to allege that Defendant's conduct proximately caused his injuries. *See In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118, 123 (2d Cir. 2013) ("Congress did not 'intend[] to permit recovery under § 2333 on a showing of less than proximate cause…."). Plaintiff's claim fails for these reasons as well.

## CONCLUSION

     For all of the foregoing reasons, Defendant Oath Inc. respectfully requests that the Complaint be dismissed in its entirety, with prejudice.

Dated: New York, New York
   November 6, 2017

          Respectfully submitted,

          DAVIS WRIGHT TREMAINE LLP


          By: */s/ James Rosenfeld*
            James Rosenfeld
            Jeremy A. Chase
            Abigail B. Everdell
          1251 Avenue of the Americas, 21st Floor
          New York, NY  10020-1104
          Tel.: (212) 489-8230
          Fax: (212) 489-8340
          E-mail:  jamesrosenfeld@dwt.com
              jeremychase@dwt.com
              abigaileverdell@dwt.com

          *Attorneys for Defendant Oath Inc.*