RECEIVED
SDNY PRO SE OFFICE

2017 DEC -5  PM 2:56

S.D. OF N.Y.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CARTER PAGE,
                    Plaintiff,

-v-

OATH INC., AND BROADCASTING
BOARD OF GOVERNORS,
                    Defendants.

Civil Action No.:  17-CV-06990-LGS

**PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/5/17

The Plaintiff,
By:  /s/ Carter Page
Carter Page
c/o Global Energy Capital LLC
590 Madison Ave., 21st floor
New York, NY 10022
Phone (212) 537-9261
Fax    (212) 537-9281
cpage@globalenergycap.com

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................... 1

   A.   Accepting all factual claims in the complaint as true .................................................. 3

II.   PRO SE REPRESENTATION AND THE SCHOLAR CARTER PAGE .................................. 5

III.   PRIVATE FIGURE ...................................................................................................... 8

IV.   OPINION AND PROVABLE FALSITY OF THE HUFFPOST PLAINTIFF OEUVRE .... 11

V.   THE U.S.A.'S BEAUTIFUL FIRST AMENDMENT AMIDST ABUSES OF POWER AND SUSTAINED EFFORTS TO INFLUENCE THE 2016 ELECTION .................................. 12

VI.   MALICIOUS, DRAMATICALLY-MISREPRESENTED, DNC-FUNDED OPPOSITION POLITICAL RESEARCH COULD NEVER QUALIFY AS "INTELLIGENCE" .......................... 13

VII.   INAPPLICABILITY OF SECTION 230, ACTIVE CONTENT DEVELOPERS ................ 15

VIII.   OTHER PRIMA FACIE EVIDENCE: KNOWLEDGE OF FALSITY OR RECKLESS DISREGARD FOR THE TRUTH ....................................................................................... 17

X.   CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Air Wis. Airlines Corp. v. Hoeper*, 134 S.Ct. 852, 863................................................. 11

*Ashcroft v. Iqbal*, 556 U. S. Reports 662, 129 S.Ct. 1937 1949, 173 L.Ed.2d 868 (2009)............ 4

*Bachchan v. India Abroad Publications Inc.*, 585 N.Y.S.2d 661, 154 Misc.2d 228 (Sup. Ct. N.Y.

   Cty. 1992) ......................................................................................... 18

*Bean LLC d/b/a Fusion GPS v. Defendant Bank and Permanent Select Committee on*

   *Intelligence*, 17-cv-2187 (D.D.C., Oct 20, 2017) ................................................ 5, 23

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................... 3

*Biro v. Condé Nast*, 963 F. Supp. 2d 255, 264 (S.D.N.Y. 2013)......................................... 3

*Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 177 (2d Cir. 2000)........................ 8

*Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196, 197, 341 N.E.2d 569, 569, 379

   N.Y.S.2d 61, 62 (1975) ............................................................................ 10

*Chau v. Lewis*, 771 F.3d 118, 129 (2nd Cir. 2014) ..................................................... 4

*Contemporary Mission, Inc. v. New York Times Co.*, 842 F.2d 612 (2d Cir. 1988)........................ 9

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) .................................. 4

*De Jonge v. Oregon*, 299 U.S. 353 (1937)............................................................. 12

*Doe v. City of New York, 583 F. Supp. 2d 444 (SDNY, 2008)*........................................... 17

*Doe v. Internet Brands, Inc.*, 824 F.3d 853. (9th Cir. 2016)......................................... 17

*Edwards v. Nat. Audubon Soc'y*, 556 F.2d 113 (2d Cir.), cert. denied, 434. U.S. 1002 (1977) ... 17

*Elias v. Rolling Stone LLC*, 16-2465-cv (2nd Cir. 2017)................................................ 3

*Elonis v. United States*, 135 S. Ct. 2001 (2015) ................................................... 22

*Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008)................................................... 20

*Fair Hous. Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1163. (9th Cir. 2008). .................................................................................................... 16

*Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010) .............................. 3

*Fridman et al v. Bean LLC et al*, 17-cv-02041, (D.D.C., Oct. 3, 2017) ............................... 4

*Fusion GPS v. Defendant Bank and Permanent Select Committee on Intelligence*, 17-cv-2187 (D.D.C., Oct 20, 2017) ............................................................................ 5

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 324 (1974) ................................ 9

*Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) ................................... 3

*Golub v. Enquirer/Star Grp., Inc.*, 89 N.Y.2d 1074, 1076 (1997) ................................... 2

*Grant v. Reader's Digest Ass'n, Inc.*, 151 F.2d 733, 735 (2d Cir. 1945). ....................... 20

*Gubarev et al v. Buzzfeed, Inc. et al*, 17-cv-60426 (S.D. Fla., Feb 28, 2017) ............... 4

*Harte-Hanks Commc'ns Inc. v. Connaughton, 491 U.S. 657(1989)* ....................... 14, 20

*Hengjun Chao v. Mt. Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) ................... 21

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ................................ 23

*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) ........................................ 12

*Hutchinson v. Proxmire*, 443 U.S. 111 (1979) ............................................. 9

*Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 587 (D.C. Cir. 2016) ............................... 8

*Lerman v. Flynt Distributing Co., Inc.*, 745 F.2d 123 (2d Cir. 1984) ........................... 9

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) ................................ 18

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) .................... 3

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ................................ 7, 11

*Nielsen v. Elaine A. Rabin M.D.*, 746 F.3d 58 (2nd Cir. 2014) ........................... 7

*NYT v. Sullivan*, 376 U.S. 254, 279-280 (1964) ................................ 18

*People v. Golb*, 23 N.Y.3d 455, 15 N.E.3d 805, 991 N.Y.S.2d 792, 2014 N.Y. Slip Op. 03426 (2014)...................................................................................................................... 23

*Phila. Newspapers, Inc v. Hepps*, 475 U.S. 767 (1986) ................................................ 11

*Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir.1994) .................................................. 21

*Rebozo v. Wash. Post Co.*, 637 F.2d 375 (5th Cir. 1981) ................................................ 8

*Reynolds v. Pegler*, 223 F.2d 429 (2nd Cir.), *cert. denied*, 350 U.S. 846 (1955) ..................... 2, 18

*Sharon v. Time, Inc.*, 575 F. Supp. 1162 (S.D.N.Y.1983) .............................................. 15

*Stepanov v. Dow Jones & Co.*, 987 N.Y.S.2d 37, at 41-42 (1st Dep't 2014)................................. 3

*Tavoulareas v. Piro*, 817 F.2d 762, 794 (D.C. Cir. 1987), cert denied, 484 U.S. 870 (1987)...... 20

*Time, Inc. v. Firestone* (1976) 424 U.S. 448, 460........................................................ 10

*Tinker v. Des Moines Ind. Comm'ty Sch. Dist.*, 393 U.S. 503, 506 (1969) ................................ 13

*United States v. Hollis*, 14-mj-00206-HBF (D. Conn., 2014) .......................................... 24

*Weyrich v. New Republic*, 235 F.3d 617, 624, 29 Media L. Rep. (BNA) 1257 (D.C. Cir. 2001) 19

*Wolston v. Reader Digest Association, Inc.*, 443 U.S. 157 (1979) ...................................... 10

*Zeran v. AOL Inc.*, 129 F.3d 327 (4th Cir. 1997) ...................................................... 16

## Statutes

18 U.S. Code § 1341 ...................................................................................... 17

18 U.S. Code § 2261A ..................................................................................... 23

18 U.S. Code § 2331(5) ................................................................................... 24

18 U.S. Code § 2332b ..................................................................................... 25

18 U.S. Code § 2339A ..................................................................................... 23

18 U.S. Code § 371 ....................................................................................... 17

18 U.S. Code § 951 ..................................................................................... 17, 19

47 U.S.C. § 230 ............................................................................................................... 1, 15

N.Y. C.P.L.R. §3014 ....................................................................................................... 3, 21

N.Y. Civ. Rights Law § 74 ........................................................................................... 13, 15

N.Y. Penal Law § 190.25 ................................................................................................... 23

**Other Authorities**

Restatement (Second) of Torts § 766 (Am. Law Inst. 1979) ...................................... 12, 22

**Rules**

ABA Model Rules of Professional Conduct Rule 4.1 ..................................................... 14

Fed. R. Civ. P. 12(b)(6) ................................................................................................... 1, 4

Fed. R. Civ. P. 26 ............................................................................................................... 5

Fed. R. Civ. P. 56 ............................................................................................................... 4

**Constitutional Provisions**

United States Constitution's First Amendment .......................................................... 12

## I. INTRODUCTION

During the months before and after the 2016 Presidential election, Defendants Oath Inc. ("Oath") and the Broadcasting Board of Governors ("BBG") have committed torts previously unseen in the history of the United States and without precedent in the annals of American law. In the wake of this man-made disaster, Oath's Motion to Dismiss follows a familiar pattern of fictional entertainment that Mr. Isikoff, Yahoo News, HuffPost, other Oath assets and their staff have employed throughout recent years and decades. Compl. ¶ 6, 72.  While Oath's impressive library of peripherally-related, inapt legal precedents offers enjoyable academic reading, the clear evidence in the Plaintiff's Compl. render most of the common law citations included in this Defendant's Memo. impertinent to the salient facts and actual realities at hand.  Remaining true to form and while demonstrating no legitimate basis for its Fed. R. Civ. P. 12(b)(6) motion, Oath instead exercises its skills as a creative 47 U.S.C. § 230 information content provider.  In this edition, the Verizon subsidiary reverts to emotional appeals leveraging timeworn Russia stereotypes with parrot-groupthink abandon as it distractedly seeks to simultaneously stir up both domestic and international political biases. Once again for old times' sake and long after its Dodgy Dossier accusations regarding Dr. Page have been entirely discredited, Oath blatantly casts him in the "central role in that controversy" which its authors and staff themselves created in the public domain (Memo. p. 1, Compl. ¶ 56-86).  While many textual elements throughout the 2016 Yahoo Report and the HuffPost Plaintiff Oeuvre are assertions of fact that clearly display defamatory meaning, after a long, painful Witch Hunt there still has been no basis found for the sensational false allegations which Oath nonetheless stubbornly clings to and assumed primary responsibility for both nationwide as well as worldwide prior to the 2016 election. Although previously a largely unknown, private figure who has served his country with

distinction as a U.S. military veteran, Dr. Page is now widely reviled following Oath's continued venal and politically motivated efforts to "expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community." *Golub v. Enquirer/Star Grp., Inc.,* 89 N.Y.2d 1074, 1076 (1997) (citation and internal quotation marks omitted).

Oath unluckily gambled in September 2016 with high hopes that some of the dirt drawn from the defamatory Dodgy Dossier deck might miraculously offer a bonanza "scoop" like cards dealt by a casino dealer with a fancy European accent in Monte Carlo.  Now, the media conglomerate's Memo. doubles down on its imprudent bets. The outrageousness of Oath's motion thus has even more important implications, particularly given the ongoing revelations that continue to flow from the pending Dodgy Dossier cases: "There is always a certain risk involved in the pleading of truth as a defense, since in proper cases and under proper instructions the jury may infer malice from the fact that a defendant repeats the defamatory matter, which is later found to be false. But here answers were served on behalf of each defendant, which not only repeated but elaborated upon the matters set forth in the original defamatory publication; even the tone and characteristics of the pleading are reminiscent of the style of the column in suit, although the answer is said to have been composed by one or more of the lawyers. It will not do to beg off on the plea that there is no proof that any of the corporate officers read this pleading before it was filed in court and that it is unverified and bears only the subscription of counsel. Despite all this, the fact remains that those who composed this answer and caused it to be filed were acting within the scope of their authority and what they did is binding upon defendants." *Reynolds v. Pegler*, 223 F.2d 429 (2nd Cir.), *cert. denied*, 350 U.S. 846 (1955).

2

Back in the real world, the 2016 Yahoo Report and a vast array of other Oath articles encompassing the HuffPost Plaintiff Oeuvre already unmistakably meet all of the New York defamation standards: "(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm." *Stepanov v. Dow Jones & Co.*, 987 N.Y.S.2d 37, at 41-42 (1st Dep't 2014). The separate causes of action including domestic terrorism and tortious interference, as allowed for in N.Y. C.P.L.R. §3014, are equally clear as the Defendants brought to bear easily evident, shocking damages. The extreme levels of persecution Dr. Page has endured for being a peripheral member of the Trump movement extend far beyond the generic harassment and damages experienced by victims of preceding defamatory incidents that included members of other groups or movements. *Elias v. Rolling Stone LLC*, 16-2465-cv (2nd Cir. 2017).

**A. Accepting all factual claims in the complaint as true**

Oath's memorandum of law reflects a continuation of the wild false assumptions and fictitious portrayals that dominated its conglomerate's spiteful articles including the life-threatening 2016 Yahoo Report, associated republications and the HuffPost Plaintiff Oeuvre. Despite the clarity of facts filed in the summary Compl., many of the brazen suppositions from the Memo. include broad conjecture that dodge the traditional standard of, "accepting all factual claims in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."[1]

---

[1]   See also: *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010); "The Court accepts the complaint's factual allegations as true and draws inferences only in the plaintiff's favor." *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 264 (S.D.N.Y. 2013); *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court's function is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the Complaint if the plaintiffs have stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

3

"Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991).  As demonstrated in Oath's Memo. and despite the information already proven in multiple ongoing Dodgy Dossier cases now proceeding in U.S. District Courts, somehow reality and the rules were lost in translation for this Defendant.

Key elements of each of the many defamatory articles fall far short of meeting the requisite standard that the, "'gist or substance of the challenged statement' is true". *Chau v. Lewis*, 771 F.3d 118, 129 (2nd Cir. 2014).  For example, Dr. Page verifiably did not own shares of Gazprom as of the time of the defamatory Graber Report. Compl. ¶ 83. Dr. Page's Nuclear Peace Journal Article did not compare sanctions with the killing of Americans. Id. ¶ 99-103.  These and countless other previous examples included throughout the Plaintiff's Compl. and the Defendant's Memo. pleadings reflect Oath's and its subsidiaries' unambiguous institutional pattern of reckless disregard for the truth.

The desperate search for an alternative reality may seem partially understandable given the ongoing series of frequent unflattering revelations that have continued to flow from the pending Dodgy Dossier cases, including in U.S. District Courts as well as other jurisdictions.[2] Compl. ¶ 87-98. An extraordinary amount of ongoing legal work and national attention has been dedicated

---

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U. S. Reports 662, 129 S.Ct. 1937 1949, 173 L.Ed.2d 868 (2009).

[2]   Among others, see: *Gubarev et al v. Buzzfeed, Inc. et al*, 17-cv-60426 (S.D. Fla., Feb. 28, 2017); *Fridman et al v. Bean LLC et al*, 17-cv-02041 (D.D.C., Oct. 3, 2017); *Bean LLC d/b/a Fusion GPS v. Defendant Bank and Permanent Select Committee on Intelligence,* 17-cv-2187 (D.D.C., Oct. 20, 2017)

to the deceitful body of opposition research in the Dodgy Dossier from 2016 that concealed or disguised the nature or source of material support or resources by politicians, expensive consultants and some of their loyal media advocates.[3]   The discovery from these pending actions will dramatically reduce the evidentiary burdens on parties in this case. Fed. R. Civ. P. 26. Although comprehensible why Oath may remain reluctant to come to grips with reality as demonstrated in their Memo., a comprehensive assimilation of the Plaintiff's Compl. and recognition of more relevant common law precedent makes clear that this Defendant's arguments are moot.

## II.  PRO SE REPRESENTATION AND THE SCHOLAR CARTER PAGE

Having dramatically misanalysed Dr. Page throughout multiple baseless, falsehood-ridden examinations of him by Oath brands over recent years, some of these latest fabrications have now continued in the judicial realm with their devious evaluation of his personal legal capabilities too: "Plaintiff purports himself pro se in this matter." (Memo. p. 6)

Contrary to the fictional depiction that Oath media assets have consistently painted in portraying Dr. Page as a greedy, immoral business person, Compl. ¶ 110-114, Dr. Page is a principled scholar whose life has been primarily driven by an interest in making the world a safer, better, more just place with a central focus on achieving peace, and an intellectual curiosity regarding potential procedures for achieving that strategic objective.  As Oath's torts have now forced him to shift focus toward the law, his approach to this case represents precisely the same

---

[3]   As a recent short summary of a few of these continued revelations, see: Todd Shepherd, "Fusion GPS paid journalists, court papers confirm," *Washington Examiner*, November 21, 2017. http://www.washingtonexaminer.com/fusion-gps-paid-journalists-court-papers-confirm/article/2641454

philosophy and primary intellectual methodology he has taken throughout his professional
career. Compl. ¶ 8, 28, 44-46.

As part of his new quest to help reestablish some semblance of justice in America following
the extreme damage inflicted by the Defendants to support their political beneficiaries in 2016,
Dr. Page became an active student member of the American Bar Association ("ABA") and other
professional legal organizations in 2017.  He has also enrolled in a part-time LLM program at a
prominent law school and will begin this coursework in January 2018.  Despite doing the best
that he can to resolve these injustices and learn as much as possible, for the foreseeable future he
will not come anywhere close to meeting the relevant threshold standards of any Bar.

At many law conferences and other Continuing Legal Education training sessions that Dr.
Page has attended over recent months, he has informally traded ideas and received suggestions
from admitted practitioners of the Bar.  These *modus operandi* are likely in no way different
from the three lawyers and other counsel representing Oath, or most other attorneys as they grow
in their practice, except for the extraordinary disadvantages the Plaintiff faces in terms of his
very limited resources, access and experience.  In an October 2017 speech by U.S. Court of
International Trade Judge Delissa Ridgway, she suggested to Dr. Page and other internationally-
focused law students that networking and gaining insights from other legal colleagues should
consistently form a cornerstone of their current education and future practice.[4]  To imply that
Dr. Page should be banned from or further punished for informally speaking with and trading
ideas with practicing lawyers (Memo. p. 6), in addition to all of the other disadvantages Oath has

---

[4]   See also: "Hon. Lorna G. Schofield: 'Making the Most of Mentorship'," NYU Law website.
http://www.law.nyu.edu/womens-leadership-network/podcasts/schofield

created for him or face further unjust penalties, ranks among the most disgraceful elements of its Memo.

Within the context of Dr. Page's ongoing, intensively expedited legal training over recent months and in the period to come, several of Oath's defamatory articles that have previously libeled him as "inexplicably stupid" and "Gomer Pyle. But Dumber" (Compl. ¶ 116, 120) will be among those falsehoods further due-diligenced and exposed over time during future proceedings of this case for their "provably false factual connotation". *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990). In the interim, "Generally, leave to amend should be freely given, and a pro se litigant in particular should be afforded every reasonable opportunity to demonstrate that he has a valid claim." (internal quotation marks and citations omitted). *Nielsen v. Elaine A. Rabin M.D.*, 746 F.3d 58 (2nd Cir. 2014).

Given the clear facts and inevitable forthcoming evidence in this case and related Dodgy Dossier litigation, it is logical that Oath would seek to further handicap Dr. Page with more stringent technical standards as part of their last-ditch effort to desperately continue their avoidance of justice. This too follows the Defendant's rich pattern of institutional unfairness and abuses.

In the wake of the severe damage created by the Defendants preceding the 2016 election and in the time since, Dr. Page has also occasionally received billable and pro bono legal assistance from criminal defense attorneys for infrequent consultations related to the Witch Hunt that largely stemmed from the initial defamatory reporting by the Defendants and the since-discredited Dodgy Dossier that sought to influence the 2016 election. Compl. ¶ 63-64, 87. Although he has never done anything illegal in or related to Russia, he has been recommended to hire an attorney as a precautionary measure. Other than the principal basis for the origination of

these completely unnecessary federal and international investigations of Dr. Page in large part stemming from the Defendants' torts (*Id.* ¶ 64) and the damages created following Verizon's and Oath's direct and indirect sponsorship of its political beneficiaries in general as well as promotion of the Dodgy Dossier in particular, this entirely separate matter is unrelated to the case in question.

## III. PRIVATE FIGURE

As Oath has noted, "Those who have voluntarily sought and attained influence or prominence in matters of social concern are generally considered public figures." *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 177 (2d Cir. 2000). Dr. Page never sought attention and instead tried to limit his media presence to the greatest extent possible throughout his life except in instances when malicious allegations required comment to prevent severe damage to himself and his company (Compl. ¶ 33-34), until the defamatory reports of September 23, 2016 made the continuation of the peaceful life he once enjoyed impossible. In response to the terrorist and other threats that Oath verifiably played a key role in helping to inspire against the Plaintiff, Dr. Page has since been forced to incessantly conduct crisis communications. He also never met Mr. Trump (Compl. ¶ 27-28), so represents the polar opposite of "President Nixon's closest friend" in *Rebozo v. Wash. Post Co.*, 637 F.2d 375 (5th Cir. 1981). Similarly, and after having never donated money to any political campaign for many years including the Trump Campaign (Compl. ¶ 28, 101), Dr. Page was never an "outspoken supporter, financial backer, and advisor of" any Prime Minister or top government official and has never "paid over $100,000 to a lobbyist to support" any politician, rendering irrelevant cases such as: *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 587 (D.C. Cir. 2016).

8

Dr. Page's Wikipedia presence began within hours of the 2016 Yahoo Article and the RFE Republication. Compl. ¶ 67. Accordingly: "His access, such as it was, came after the alleged libel, and was limited to responding to the announcement of the award. Those charged with alleged defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111 (1979).

Furthermore, the Plaintiff did not previously fulfill any element of the specific criteria for "limited purpose" public figure status as set by the Second Circuit.  Prior to the 2016 Yahoo Report, Dr. Page never met any of these four requisite standards as seen in federal precedent from New York such as *Contemporary Mission, Inc. v. New York Times Co.*, 842 F.2d 612 (2d Cir. 1988)(citations omitted); *Lerman v. Flynt Distributing Co., Inc.*, 745 F.2d 123 (2d Cir. 1984): (1) he never invited public attention to his views in an effort to influence others prior to the alleged Russian hacking incident; (2) he never voluntarily injected himself into the public controversy related to alleged Russian influence on the election; (3) he never assumed a position of prominence in the public controversy until Oath and its political partners which the Verizon Executives helped to finance placed him at the very center of it with their world premiere excerpts from the Dodgy Dossier; and (4) he had never previously maintained regular and continuing access to the media until it became a matter of life and death to begin clearing his name.  "Absent clear evidence of general fame or notoriety in the community and pervasive involvement in ordering the affairs of society, an individual should not be deemed a public figure for all aspects of his life." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 324 (1974).  Not only did Dr. Page demonstrate clear evidence of not meeting those relevant criteria, the only "reference to the individual's participation in the particular controversy", *Id.*, was that cruelly initiated by Oath assets in conjunction with their Co-Defendant, the lead propaganda outlet of the U.S.

Government, which collectively first created the controversy in order to support the DNC, the Clinton Campaign, their associates, consultants and additional sponsors on September 23, 2016. Even in other instances when wrongdoing related to a controversy has occurred, which is clearly not the case here contrary to the outrageous allegations by Oath and their Dodgy Dossier sources, courts have rejected, "the further contention of respondents that any person who engages in criminal conduct automatically becomes a public figure for purposes of comment on a limited range of issues relating to his conviction". *Wolston v. Reader Digest Association, Inc.*, 443 U.S. 157 (1979).

A defamation suit plaintiff need not even introduce any evidence of a compensable injury to their reputation, and may proceed "without regard to measuring the effect the falsehood may have had upon a plaintiff's reputation," but instead only as to "'personal humiliation, and mental anguish and suffering' as examples of injuries which might be compensated consistently with the Constitution upon a showing of fault." *Time, Inc. v. Firestone* (1976) 424 U.S. 448, 460.

Oath and members of its staff including Mr. Isikoff have clearly failed New York's Chapadeau test beyond any shadow of a doubt since: "the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196, 197, 341 N.E.2d 569, 569, 379 N.Y.S.2d 61, 62 (1975).   The *New York Times* ("NYT"), the *Washington Post*, the *Wall Street Journal*, and CNN are just a few of the responsible media parties that contacted Dr. Page and observed rudimentary standards of information gathering after they heard of the disgraceful fictional information from the Dodgy Dossier. Compl. ¶ 33, 79, 81.  The extraordinary array of pending Dodgy Dossier cases in U.S. District Courts and foreign jurisdictions including ongoing related discovery already represents a

veritable arsenal of proverbial smoking guns regarding the most egregious defamation and other torts by Oath related to the discredited document that they premiered on the world stage.

## IV. OPINION AND PROVABLE FALSITY OF THE HUFFPOST PLAINTIFF OEUVRE

Significant precedent "dispels any misimpression that there is a so-called opinion privilege." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990).  Apart from Oath's similar extensive defamatory reporting by its journalists and for each additional article from the HuffPost Plaintiff Oeuvre that qualifies as opinion (Compl. ¶ 99-122, *intra*), the more stringent requirements of proving falsity have been met. *Phila. Newspapers, Inc v. Hepps*, 475 U.S. 767 (1986).  For example, the defamatory Patterson Report falsely claims that Dr. Page's brief interactions with Ambassador Kislyak came "just before Trump operatives stripped the party platform of a pledge to aid Ukraine against Russian aggression", which has already been entirely disproven with the basic preliminary facts already presented in this case (Compl. ¶ 113, 122 n. 102, Exh. 19(a)). "But the identity of the relevant reader or listener varies according to the context. In determining whether a falsehood is material to a defamation claim, we care whether it affects the subject's reputation in the community." *Air Wis. Airlines Corp. v. Hoeper*, 134 S.Ct. 852, 863.  In the context of the anti-Trump readers and advertisers that support HuffPost, their readers were destined to be triggered with precisely the violent widespread response that has since been observed, bringing Dr. Page wide-scale anguish, humiliation, embarrassment and damage throughout the U.S. as well as in the global community.  Compl. ¶ 29, 85, 152-154.

As further context and as an information content provider actively involved in the development of original content, Oath's liability is clear. "It is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct

himself in the activity in such a manner as to create an unreasonable risk of harm to others."
Restatement (Second) of Torts § 308 (Am. Law Inst. 1965); Compl. ¶ 29, 84-85, 99-122.  Given
the damages subsequently created, choosing to only focus on Dr. Page in September 2016 among
the many people subsequently targeted by Mr. Steele's Dodgy Dossier research overshadows any
commercial and political interests that Oath may have had to create their fantastic fiction: "It is
the intent to cause injury that is the gravamen of the tort, and the State's interest in preventing
emotional harm simply outweighs whatever interest a speaker may have in speech of this type."
*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988).  The harshly partisan and aggressive
disclaimer consistently included on many HuffPost active content development webpages prior
to November 8, 2016, further indicated Oath's clear intent to cause injury, emotional harm and
even more life-threatening risks. Compl. ¶ 29.

## V. THE U.S.A.'S BEAUTIFUL FIRST AMENDMENT AMIDST ABUSES OF POWER AND SUSTAINED EFFORTS TO INFLUENCE THE 2016 ELECTION

Oath's and its collaborative Co-Defendant's extraordinarily reckless actions to harm Dr. Page
extend so far beyond the bounds of statutes, common law and the Constitution that any reference
to the First Amendment is entirely inapplicable in their defense.  Instead, the only violations of
these essential civil rights relate directly to the unusual damages suffered by the Plaintiff.

"The right of peaceable assembly is a right cognate to those of free speech and free press and
is equally fundamental."  *De Jonge v. Oregon*, 299 U.S. 353 (1937).  Oath widely departed
outside the tenets of the United States Constitution's First Amendment given the Defendants'
clear knowledge of falsity or reckless disregard for the truth exhibited in their respective world
premieres of the defamatory Dodgy Dossier accusations on September 23, 2016, as well as over
the following days and months since. Having previously exercised his right of peaceable
assembly as an unpaid volunteer (Compl. ¶ 28, 113), the nationwide confusion and disruption

12

created within the Trump Campaign by the Defendants made it necessary for Dr. Page to take a

leave of absence from his volunteer work within days of the 2016 Yahoo Report and RFE

Republication. (Albeit entirely mischaracterized, acknowledged by Oath on Memo. p. 5, 11).

    As a little-known scholar in the field of political economy, Dr. Page also previously

exercised his First Amendment Rights by giving two entirely benign speeches in Moscow as he

had done at Russian universities countless times before (Compl. ¶ 45-48). "It can hardly be

argued that either students or teachers shed their constitutional rights to freedom of speech or

expression at the schoolhouse gate." *Tinker v. Des Moines Ind. Comm'ty Sch. Dist.*, 393 U.S.

503, 506 (1969).   Yet, Oath misrepresented these lectures and associated travels dramatically in

accordance with the opposition political research consultants that supported their defamatory

wide-scale media operations and materially bolstered the agenda of Oath's and their parent

Verizon's support of favored political beneficiaries.

## VI. MALICIOUS, DRAMATICALLY-MISREPRESENTED, DNC-FUNDED OPPOSITION POLITICAL RESEARCH COULD NEVER QUALIFY AS "INTELLIGENCE"

Many responsible media organizations received briefings from the Clinton Campaign/DNC-

financed consultant Mr. Steele and upheld basic professional standards (Compl. ¶ 55, 79, 87-93,

et al).  The entire false premise of the primary source for the 2016 Yahoo Report as legitimate,

official government "intelligence" rather than opposition political research funded by Oath's

political beneficiaries has been unquestionably and fully disproven.  Mr. Steele and the Oath

subsidiaries that repeated his false claims thus fall entirely outside the scope of N.Y. Civ. Rights

Law § 74.  To be clear, opposition political research sponsored by private parties with the

express intent of harming others either indirectly in the case of then-candidate Trump, or directly

in the case of Dr. Page could never conceivably qualify as an "official proceeding". (*Id.*)  Given

recent revelations that have continued to flow as the truth belatedly comes out, the only people

who still believe that Mr. Steele is a "well-placed Western intelligence source" (Compl., ¶ 40)

are some partisan political operatives.[5]  As demonstrated in Compl. ¶ 79 with the comparatively

responsible journalistic standards displayed by other media organizations, "…recklessness may

be found where there are obvious reasons to doubt the veracity of the informant or the accuracy

of his reports." *Harte-Hanks Commc'ns Inc. v. Connaughton,* 491 U.S. 657, 688 (1989).

While MSNBC host Joy Reid is briefly mentioned elsewhere in the Compl. (¶ 60), Harry

Reid (no relation) was not, as incorrectly referenced in Oath's motion so he falls outside the

scope of this case too. (Memo p. 1, 5, 9-10, 16)  As a legal scholar, Mr. Reid[6] instead exercised

basic standards of professional responsibility and judgment by not displaying such completely

reckless disregard for the truth regarding Dr. Page as frequently demonstrated by Oath prior to

the 2016 election and over the months since.  ABA Model Rules of Professional Conduct Rule

4.1.  Further underscoring the completely illegitimacy of the co-sponsors of Mr. Steele who

authored the deceitful opposition political research report upon which the 2016 Yahoo Report

was based (Compl. ¶ 42, 60, 74, 83, 87-88), Mr. Reid has himself assessed the DNC, which

funded the consultant that provided the foundation for Oath's defamatory reporting, as

"worthless" during the time this organization sponsored the Dodgy Dossier.[7]  Similarly, Mrs.

Clinton (J.D., Yale Law School, 1973) and senior members of her team often exercised requisite

levels of caution by directly attributing pre-election reports regarding Dr. Page as well as

---

[5]   Adam Entous, Devlin Barrett, and Rosalind Helderman, "Clinton campaign, DNC paid for research that led to Russia dossier," *Washington Post*, October 24, 2017. https://www.washingtonpost.com/world/national-security/clinton-campaign-dnc-paid-for-research-that-led-to-russia-dossier/2017/10/24/226fabf0-b8e4-11e7-a908-a3470754bbb9_story.html

[6]   "Sen. Harry Reid Joins UNLV Boyd School of Law as Distinguished Fellow," April 10, 2017.

[7]   Jessie Hellmann, "Reid: DNC was 'worthless' under Wasserman Schultz," The Hill, December 22, 2016.  http://thehill.com/homenews/campaign/311506-reid-dnc-was-worthless-under-wasserman-schultz

associated liability for the defamatory falsehoods from the Dodgy Dossier to the fraudulent subsidiaries, employees and affiliates of Verizon's multi-billion dollar media and entertainment conglomerate Oath, including Mr. Isikoff: "I mean, you know, according to Michael's reporting... it's like a Batman movie...crazy".  Compl. ¶ 78, Exh. 5.

Simple common sense makes clear that Oath's attempts to downplay their false insinuations which flourished straight from the defamatory Dodgy Dossier also fail miserably: "If a statement is susceptible to a construction which is libelous per se, then special damages need not be alleged, even though that construction might depend upon the drawing of inferences or the application of simple logic or common sense. The libels here alleged are well within the group of serious and hence presumptively damaging statements upon which the courts have traditionally allowed suit without allegations designed to establish that the claim is worth litigating." *Sharon v. Time, Inc.*, 575 F. Supp. 1162 (S.D.N.Y.1983)

The legitimate "official proceedings", N.Y. Civ. Rights Law § 74, demonstrated in the U.S. Director of National Intelligence's authentic intelligence report offered an analysis of alleged illicit media activities by actors preceding the 2016 U.S. election. (Compl. ¶ 138-142) This declassified U.S. Government document stands as the only genuine intelligence report relevant to this case and provides further evidence, explanations and analysis directly pertinent to the torts committed by Oath and its Co-Defendant BBG as demonstrated in the Compl. (e.g. *Id.* 139)

## VII.       INAPPLICABILITY OF SECTION 230, ACTIVE CONTENT DEVELOPERS

HuffPost and its parent companies have lost their Section 230 immunity as they have long stood as an "information content provider" that is "responsible, in whole or in part, for the creation or development of information". 47 U.S.C. § 230.  This standard has extended throughout HuffPost's history, as its co-founder stated in conversation with one of their

selectively chosen active content development partners, then-Senator John Kerry, during a

Congressional hearing on journalism: "You have kindly blogged on The Huffington Post. There's

a lot of original content on the site."[8]  Oath CEO Tim Armstrong ("Mr. Armstrong") himself

oversaw the acquisition of the HuffPost information content provider and personally managed

the subsequent transformation of AOL Inc. as Chairman and CEO since 2008 (Compl. ¶ 27),

rendering the historic pre-acquisition precedent of AOL Inc. as a pure-play "interactive computer

service" implausible throughout much of this new millennium.  *Zeran v. AOL Inc.*, 129 F.3d 327

(4th Cir. 1997).  Accordingly, some of the representative Oath employees who more intensively

and recently engaged in information content creation or development have clearly included

HuffPost Foreign Affairs Reporter Jessica Schulberg, Foreign Affairs Reporter Akbar Shahid

Ahmed, HuffPost Washington Bureau Chief Ryan Grim, Reporter Daniel Marans, Congressional

Reporter Matt Fuller, Morning Email Editor Lauren Weber, HuffPost Politics Managing Editor

Amanda Terkel, among others. (Compl. ¶ 21, 99, 104, 107, 109, 118-119).  "Congress sought to

immunize the removal of user-generated content, not the creation of content." *Fair Hous.*

*Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1163. (9th Cir. 2008).

   This business model is representatively exhibited by HuffPost's recently completed "Listen

to America Tour"[9] which sought to continue a long pattern of actively developing new content

(Compl. ¶ 129).  The same holds for so-called "Contributors", whose information content

HuffPost staff were in part responsible for the active development of.  Given this continued

---

[8]   "The future of journalism: Hearing before the Subcommittee on Communications,
Technology, and the Internet of the Committee on Commerce, Science, and Transportation,"
United States Senate, 111th Congress, First Session, May 6, 2009.
[9]   https://www.huffingtonpost.com/feature/listen-to-america.  See also: Lukas Alpert, "HuffPost
Goes on 1 Million Bus Tour to Promote New, Anti-Elitist Mission," *Wall Street Journal*,
September 21, 2017.

pattern of operations, Oath and its other subsidiaries including Yahoo News have clearly,

"ceased to be a passive host of third-party information… ("Section 230(c)(1) would not

immunize [defendants] with respect to any information [they] developed or created entirely by

[themselves].")." *Doe v. City of New York,* 583 F. Supp. 2d 444 (SDNY, 2008).

Similarly, the separate but associated domestic terrorism and other counts of this case parallel

comparable Section 230 decisions related to the personal safety of plaintiffs and for those

relevant parties who might otherwise remain eligible, as courts have refrained from immunizing

defendants in ways that "would stretch the CDA beyond its narrow language and its purpose".

*Doe v. Internet Brands, Inc.*, 824 F.3d 853 (9th Cir. 2016).

## VIII.   OTHER PRIMA FACIE EVIDENCE: KNOWLEDGE OF FALSITY OR RECKLESS DISREGARD FOR THE TRUTH

When a journalist knows or suspects something they wrote is untrue, protection vanishes.

*Edwards v. Nat. Audubon Soc'y*, 556 F.2d 113 (2d Cir.), cert. denied, 434. U.S. 1002 (1977). A

judgment will also stand if the journalist, "had serious doubts about the truth of the statement

that the appellees were paid liars." *Id.*, 119.  While the *Edwards* standard once made it "difficult

to conceive of any epithet better calculated to subject a scholar to the scorn and ridicule of his

colleagues may have," (*Id.*, 121-22), Oath's collective, verifiably-false epithets and other

offenses have reached new, previously inconceivable lows since September 23, 2016.  Falsely

branding Dr. Page as a subject of completely outrageous criminal allegations instigated by early

excerpts from Mr. Steele's Dodgy Dossier is worse than inconceivable, achieving previously

unprecedented levels of recklessness.  Compl. ¶ 87-98; 18 U.S. Code § 371;18 U.S. Code § 951;

18 U.S. Code § 1341.

Mr. Isikoff's patently clear mischaracterizations of Mr. Steele as a legitimate government

authority, rather than a political consultant indirectly funded by Verizon's CEO Lowell McAdam

("Mr. McAdam") and other Clinton Campaign and DNC supporters, has now been proven verifiably false. Compl. ¶ 40-53, 87-97, 131; *Reynolds v. Pegler*, 223 F.2d 429 (2nd Cir. 1955). These readily apparent facts and the related court proceedings that have continued to expose them (e.g., Compl. ¶ 79), coupled with Mr. Isikoff's extensive experience in Washington (*Id.*, 69-77), already offer an extraordinary wealth of evidence regarding his "knowledge that they are false or in reckless disregard of their truth or falsity". *NYT v. Sullivan*, 376 U.S. 254, 279-280 (1964). Mr. Isikoff's 1999 book displayed an incomparable knowledge of the exact practice that he would himself play the primary role in leading during the weeks before the 2016 election: "lies to the public and to a court, the smearing of innocents... private investigators and spin doctors whose primary purpose was to smash... and destroy..." (Compl. ¶ 70-71). Directly reflective of the defamatory allegations from the Dodgy Dossier that he and his employer premiered in September 2016, one of his other books, published in 2006, described a perfectly analogous precedent of a "sexed up" report that reflected a darker "...drama – involving intelligence, the media, and leaks – played out to a tragic conclusion..." (*Id.* ¶ 77).

Entirely misquoting geographic scope and in turn falsely imputing a treasonous connotation to a benign academic lecture regarding "mutual respect", Compl. ¶ 45-47, clearly represents another example of Oath's pattern of "gross distortion" and "a material change in the statement's meaning". *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991). Such details are highly relevant for legal analysis purposes as it helps determine whether the speech "relates to a matter of public concern". *Bachchan v. India Abroad Publications Inc.*, 585 N.Y.S.2d 661, 154 Misc.2d 228 (Sup. Ct. N.Y. Cty. 1992). By all measures, the factual content of Dr. Page's NES Academic Lecture clearly did not relate to a matter of public concern until it was falsely represented by Oath as another element of Mr. Isikoff's grandiose fictional narrative.

The falsehood of the misquote of Hope Hicks (Id. ¶ 50) by Mr. Isikoff and Oath's editors is also material because the distinction exhibits a further pattern of reckless disregard for the truth, particularly as he thereby maliciously implicates Dr. Page in yet another scandalous alleged crime punishable by up to ten years in prison. 18 U.S.C. § 951. These and other reckless misrepresentations by Oath journalists and staff spurred a national and worldwide Witch Hunt of imposing proportions, that precipitated domestic terrorist threats. Although this particular blatantly obvious error was subsequently corrected hours later in the RFE Republication, it stands among the criminal activities that the defamatory 2016 Yahoo Report falsely libeled Dr. Page with based on misrepresentations from the Dodgy Dossier, which had been paid for by a campaign that Mr. McAdam contributed to and Mr. Armstrong (collectively, the "Verizon Executives") played a key role in helping to launch (Compl. ¶ 31-32, 131). Given provable falsity in all instances, each claim remains entirely valid because "[f]or a statement to be actionable under the First Amendment, it must at a minimum express or imply a verifiably false fact about appellant" *Weyrich v. New Republic*, 235 F.3d 617, 624, 29 Media L. Rep. (BNA) 1257 (D.C. Cir. 2001).

2d Cir. Judge Learned Hand explained why falsely calling somebody a "communist" around the time of the prior McCarthyism era was libelous per se, holding:

> The interest at stake in all defamation is concededly the reputation of the person assailed; and any moral obliquity of the opinions of those in whose minds the words might lessen that reputation, would normally be relevant only in mitigation of damages. A man may value his reputation even among those who do not embrace the prevailing moral standards; and it would seem that the jury should be allowed to appraise how far he should be indemnified for the disesteem of such persons.
> [I]n New York if the exception covers more than such a case, it does not go far enough to excuse the utterance at bar. [Citation.], following the old case of Moffatt v. Cauldwell, 3 Hun 26, 5 T.&C. 256, held that the imputation of extreme poverty might be actionable; although certainly 'right-thinking' people ought not shun, or despise, or otherwise condemn one because he is poor…

> We do not believe, therefore, that we need say whether 'right-thinking' people would
> harbor similar feelings toward a lawyer, because he had been an agent for the Communist
> Party, or was a sympathizer with its aims and means. It is enough if there be some, as
> there certainly are, who would feel so, even though they would be 'wrong-thinking'
> people if they did.
> *Grant v. Reader's Digest Ass'n, Inc.*, 151 F.2d 733, 735 (2d Cir. 1945).

As part of their consistent and dedicated information content development campaign to
encourage readers to gravitate toward dangerous "wrong-thinking" tendencies through a long
series of material factual inaccuracies which have in turn helped to further inspire domestic
terrorist threats against Dr. Page, all of the articles in the HuffPost Plaintiff Oeuvre clearly
demonstrate a reckless disregard for the truth or worse (Compl. ¶ 21, 29, 99-122), "in
conjunction with [each] false defamatory statement." *Tavoulareas v. Piro*, 817 F.2d 762, 794
(D.C. Cir. 1987), cert denied, 484 U.S. 870 (1987).

A few Oath articles may indeed be time-barred.  Memo. p. 23.  The full scope of damages
will be further clarified during proceedings next year, but part of the intention of the vast,
representative panoply of the HuffPost Plaintiff Oeuvre "establishes actual malice with
convincing clarity". *Harte-Hanks Commc'ns Inc. v. Connaughton, 491 U.S. 657(1989)*.  This
complex case represents the Exxon Valdez of Defamation given the "stark unpredictability",
massive and evolving scale of damages on a national level as the whole truth about last year's
misadventures by the Defendants, their real sources and their beneficiaries in this case continue
to become known.  *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008).  As in that earlier
precedent debacle and associated litigation, the complete specifics surrounding this more recent
devastating human-caused disaster will be more fully revealed as the parties eventually move
into the discovery process.

## IX. CLEAR EVIDENCE OF DOMESTIC TERROR AND TORTIOUS INTERFERENCE

"Separate causes of action or defenses shall be separately stated and numbered and may be stated regardless of consistency. Causes of action or defenses may be stated alternatively or hypothetically." N.Y. C.P.L.R. §3014. Albeit in part similarly stemming from the same false Dodgy Dossier allegations and other defamatory articles by the Defendants that led to significant evidence regarding causes of action that extend far beyond hypotheticals, the essential constituent details of the representative domestic terrorist claims and other counts are stated and numbered accordingly (Compl. ¶ 15, 85). Tortious interference claims have only been dismissed when the "factual allegations underlying each… other tort claims are virtually identical to the facts underlying his defamation claim". *Hengjun Chao v. Mt. Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (citation omitted). This is obviously not the case here in this action, given the widespread, unprecedented damages inflicted upon Dr. Page that likely extend far beyond any other prior libel ruling in U.S. history. These resultant offenses clearly enter into the realm of domestic terrorism, among other damages, based on the facts presented. Compl. ¶ 84-85.

With respect to Compl. Count 4, the torts by Oath and their Co-Defendant against Dr. Page meet each of the relevant elements: "In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship." *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir.1994). First, Oath's articles (Compl. Exh. 1, ¶ 83) and Memo. (p. 1), have each correctly acknowledged those relationships with international energy companies. Second, the Defendant's interference with all of Dr. Page's business dealings and his entire life is manifest (Compl. ¶ 28, 84-85). Third, the use of dishonest, unfair, or improper means have already been initially exposed given Oath's

21

relationship with the opposition political researcher Mr. Steele (Id. 42, 53, 71-80).  Finally, Oath has injured not only the associations with businesses that Dr. Page previously had a relationship with, but nearly all of his personal contacts whom he has developed relationships with over the course of many decades (Id. 24, 62, 75, 84-85, 95-96, 180).

"There can be no real dispute that recklessness regarding a risk of serious harm is wrongful conduct… Someone who acts recklessly with respect to conveying a threat necessarily grasps that he is not engaged in innocent conduct. He is not merely careless. He is aware that others could regard his statements as a threat, but he delivers them anyway." *Elonis v. United States*, 135 S. Ct. 2001 (2015).  Having written a book acknowledging that illicit actions by private investigators, "spin doctors" and other consultants acting on behalf of politicians to "smash…and destroy… [their] enemies" represent wrongful conduct, there can be no dispute that the irresponsible conduct by Mr. Isikoff, Oath, and its subsidiaries to support select political beneficiaries created specific risks of even more serious harm for Dr. Page. (Compl. ¶ 70-73).

Given Dr. Page's role as Managing Partner of GEC (Compl. ¶ 8) as well as Mr. Isikoff's knowledge of his business activities and the intentional damage created through his reckless disregard for the truth, it is also readily apparent to any reader, judge or member of a jury that his inability to work and remain safe (*Id.* ¶ 15) due to domestic terrorist threats (*Id.* ¶ 85) "intentionally and improperly interferes with the performance of a contract… between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." Restatement (Second) of Torts § 766 (Am. Law Inst. 1979).

In New York and with respect to scholars like Dr. Page, "…we conclude that injury to reputation is within the 'injury' contemplated by Penal Law § 190.25. Many people, particularly with a career in academia, as relevant to this case, value their reputations at least as much as their property, and we believe the legislature intended that the scope of the statute be broad enough to capture acts intended to cause injury to reputation." *People v. Golb*, 23 N.Y.3d 455, 15 N.E.3d 805, 991 N.Y.S.2d 792, 2014 N.Y. Slip Op. 03426 (2014).

The provisions of 18 U.S. Code § 2339A, focus on action that "conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation…"  Given the Media Massacre Tactics displayed by Oath, the actions taken by those inspired by their defamatory reports based on the Dodgy Dossier (e.g., Compl. ¶ 84-86), and the concealment and disguises of the source of material support or resources already exposed in *Bean v. Bank* (D.D.C. 2017), the basis for the further review of these torts is imminently clear.  The Court has acknowledged both the Constitutionality as well as the difficulty of cases such as this which may arise: "We conclude that the material-support statute is constitutional as applied to the particular activities plaintiffs have told us they wish to pursue. We do not, however, address the resolution of more difficult cases that may arise under the statute in the future." *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010).

Far more modest, local and small-scale social media pranks have led to affirmative decisions in otherwise equivalent domestic terrorism cases, perhaps most notably and similarly in the practice of "swatting" – the false reporting of serious law enforcement events (e.g., Compl. ¶ 40-42). The offenses by each defendant in this claim also clearly meet the terms of 18 U.S. Code § 2261A, whereas the defamatory reports displayed "the intent to… harass… or place under

surveillance with intent to harass, or intimidate another person, uses… any interactive computer service or electronic communication service or electronic communication system of interstate commerce…that (A) places that person in reasonable fear of the death of or serious bodily injury to a person…" Dr. Page understandably has had a reasonable fear of death or serious bodily injury since September 23, 2016, given the threats that have resulted from Oath's pranks (e.g., Compl. ¶ 85). Consistent with the false insinuation that Mr. Steele might be a legitimate U.S. intelligence source rather than a hired political research consultant seeking to damage his financial sponsors' campaign opponent, swatting tactics may consist of a diverse and creative range of false identity pranks related to law enforcement operations meeting each requisite element of the definition of domestic terrorism. See 18 U.S. Code § 2331(5): "acts dangerous to human life that are a violation of the criminal laws of the United States or of any State; appear to be intended—to intimidate or coerce a civilian population; to influence the policy of a government by intimidation or coercion; or to affect the conduct of a government by mass destruction, assassination, or kidnapping; and occur primarily within the territorial jurisdiction of the United States." (internal letters and numbers omitted). In these more benign and little-known swatting cases, defendants have been held accountable by federal courts when they, for example: "…fraudulently obtain the personal identifiers of certain telecommunication employees and impersonate the customer of the targeted telephone number, impersonate the telecommunications employee capable of initiating changes to the targeted telephone number..."[10]

---

[10]   See for example, "Individual Pleads Guilty in Swatting Conspiracy Case: Defendant Faces 13 Years in Federal Prison," U.S. Attorney's Office, Northern District of Texas, January 29, 2009. https://archives.fbi.gov/archives/dallas/press-releases/2009/dl012909.htm
Also: *United States v. Hollis*, 14-mj-00206-HBF (D. Conn., 2014).

Albeit misrepresented, the Graber Report and other Oath stories correctly acknowledge that Dr. Page has had a business relationship with the Russian energy company Gazprom (e.g., Compl. ¶ 85).  Dr. Page also had existing and prospective business relationships with other energy companies and financial institutions. (Id., ¶ 180) As preliminarily explained and illustrated throughout the Compl., "the offense obstructs, delays, or affects interstate or foreign commerce, or would have so obstructed, delayed, or affected interstate or foreign commerce if the offense had been consummated." 18 U.S. Code § 2332b.

Finally, as for whichever big-time hired attorney or corporate officer of Oath characterized the clear terrorism and other associated claims as "patently frivolous" (Memo. p. 23), they should look in the mirror and ask themselves a simple question: If they or members of their family had anonymous potential assailants threatening to murder them based on complete lies written by journalists to advance select political beneficiaries, neither of whom they had ever even spoken with, how "patently frivolous" would they consider those dangerous menaces?

## X.  CONCLUSION

Based on the foregoing, Plaintiff Dr. Page respectfully requests that this Court deny Defendant's Motion to Dismiss Plaintiff's Complaint. In the alternative, Plaintiff requests that the Court grant him leave to amend his complaint to address any deficiencies identified by the Court, and any other relief this Court deems just and proper.

Dated: New York, New York
      December 5, 2017

                                 Very respectfully,

                                 By:  /s/ Carter Page
                                 Carter Page
                                 c/o Global Energy Capital LLC
                                 590 Madison Ave., 21st floor
                                 New York, NY 10022

Phone (212) 537-9261
Fax     (212) 537-9281
cpage@globalenergycap.com