UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

:

CARTER PAGE,                                                    :

Plaintiff,                        :

:

-against-                              :

:

OATH INC., et al.,                                             :

Defendants.   :

:

------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/20/2018

17 Civ. 6990 (LGS)

**OPINION AND ORDER**

LORNA G. SCHOFIELD, District Judge:

Pro se Plaintiff Carter Page sues Defendants Oath Inc. ("Oath") and Broadcasting Board of Governors. Oath moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss the claims against it -- defamation, tortious interference with business relations and terrorism transcending national boundaries. Oath's motion is granted.

## I.      BACKGROUND

The following alleged facts are drawn from the Complaint and documents that are attached to the Complaint. The allegations are assumed to be true only for purposes of this motion, which tests the sufficiency of the Complaint. The facts are construed, and all reasonable inferences are drawn, in favor of Plaintiff as the non-moving party. *See Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017).

### A.  The Parties Relevant to This Motion

Plaintiff Carter Page is a financial executive and foreign policy scholar. In 2008, he founded Global Energy Capital LLC, which specializes in investment advisory and direct investments in the energy sector worldwide. In early 2016, Plaintiff was an unpaid, informal advisor to the Donald J. Trump Campaign (the "Campaign"). Plaintiff never met nor spoke to Donald J. Trump.

1

Defendant Oath Inc. became a subsidiary of Verizon Communications Inc. as of June 13, 2017, and is a digital media company comprised of more than fifty media and technology brands. Non-parties Yahoo and HuffPost are separately incorporated subsidiaries of Oath.

### B. The Yahoo News Article

At the center of the Complaint is a news article published on September 23, 2016, by Yahoo News and titled "U.S. intel officials probe ties between Trump adviser and Kremlin" (the "Article").  The Article "falsely accused [Plaintiff] of participating in an alleged conspiracy to commit crimes against the U.S. Democratic Party's Leadership, not to mention a conspiracy to undermine American democracy and the 2016 U.S. election.  With respect to [Plaintiff], these allegations were wholly and completely false."

The Article states, in relevant part, "U.S. intelligence officials are seeking to determine whether an American business man [Carter Page] identified by Donald Trump as one of his foreign policy advisers has opened up private communications with senior Russian officials . . . ."  The Article states that U.S. officials received intelligence reports that Page had a meeting in Moscow with Igor Sechin -- a close Putin associate and the executive chairman of Russia's leading oil company, Rosneft -- and a separate meeting with Igor Diveykin -- a top Putin aide. With respect to Sechin, but not Diveykin, the Article used hedging language, stating "[t]hat meeting [with Sechin], if confirmed," and referring to the meeting as an "alleged meeting." Plaintiff never met or communicated with either Sechin or Diveykin.

The Article further states:

The activities of Trump adviser Carter Page, who has extensive business interests in Russia, have been discussed with senior members of Congress during recent briefings about suspected efforts by Moscow to influence the presidential election, the sources said.  After one of those briefings, Senate minority leader Harry Reid wrote FBI Director James Comey, citing reports of meetings between a Trump adviser (a reference to Page) and 'high ranking sanctioned individuals' in Moscow over the summer as evidence of

'significant and disturbing ties' between the Trump campaign and the Kremlin that needed to be investigated by the bureau.

The Article also cites "[a] senior U.S. law enforcement official" who "did not dispute" that Plaintiff's alleged talks with senior Russian officials were being investigated.

In addition to the reported meetings between Page and the two Russian officials, the Article contains other false or misleading statements not critical to the resolution of this motion. Yahoo News knew that at least some of the statements in the article were untrue.

The Article was available on the Internet. The substance of the Article was republished (including by Oath subsidiary HuffPost) and made available worldwide, and it was translated into Russian and Ukrainian, sparking a "worldwide" controversy.

Following the Article's publication and republication, Plaintiff received "many" death threats, also described as "an escalating and sustained series of death threats," particularly in relation "to Defendant's false accusations that he met with Mr. Sechin and Mr. Diveykin." Plaintiff received a voicemail that included the following: "Go to trade out your [expletive] country for some [expletive] Russian dollars . . . . You think you're not, you know[,] you're not in [expletive] in cahoots with [expletive] Rosneft and every [expletive] Russian oligarch over there? . . . . If it was up to me, after we [expletive] tried you for treason, we'd take you out in the street and beat the [expletive] out of you with baseball bats." The allegedly defamatory articles also damaged Plaintiff's reputation "throughout the United States and around the world," resulting in several financial institutions and potential clients refusing to do business with Plaintiff and his company.

### C.  The Complaint

On September 14, 2017, Plaintiff filed the Complaint, alleging defamation based on the Article and other articles published after June 2016, most of them authored by HuffPost

3

"contributors."  The Complaint also alleges that Defendant's publication of the Article and other articles constituted terrorism by creating a substantial risk of bodily injury to Plaintiff, and damaged Plaintiff's business relationships.

## II.    STANDARD

On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the non-moving party's favor, *id*. at 104, but gives "no effect to legal conclusions couched as factual allegations," *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017) (internal quotation marks omitted).  The pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citation omitted).  "The Complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."  *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247–48 (2d Cir. 2017) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (alteration omitted)).

Courts must "liberally construe pleadings and briefs submitted by pro se litigants, reading such submissions to raise the strongest arguments they suggest."  *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) (internal quotation marks omitted).  "The policy of liberally construing pro se submissions is driven by the understanding that implicit in the right to self-representation is an obligation . . . of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training."  *Id.* at 156–57 (internal quotation marks omitted).

4

### III.    DISCUSSION

#### A.  Federal Claim Under the Anti-Terrorism Act

The Complaint asserts one claim under federal law, a violation of the Anti-Terrorism Act ("ATA") based on Oath's alleged acts of terrorism transcending national boundaries.  18 U.S.C. § 2333.  This claim fails as a matter of law.

Section 2333 of the ATA creates a civil cause of action for "[a]ny national of the United States [who is] injured in his or her person, property, or business by reason of an act of international terrorism . . . ."  Section 2331 defines "international terrorism" as activities that:

(A)    involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B)    appear to be intended --
    (i)    to intimidate or coerce a civilian population;
    (ii)    to influence the policy of a government by intimidation or coercion; or
    (iii)    to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C)    occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum . . . .

The ATA thus has "four separate requirements" for an act to constitute international terrorism -- "that the act at issue (1) involve violence or endanger human life; (2) violate federal or state criminal law if committed in the United States; (3) appear intended to intimidate or coerce civilian population, influence government policy, or affect government conduct by specified means; and (4) occur primarily outside the United States or transcend national boundaries." *Linde v Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018) (citing *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 68 (2d Cir. 2012)).

The Complaint lacks sufficient factual allegations to state a claim under the ATA.  Here, the alleged act of international terrorism committed by Oath is the publication of the Article,

which included allegedly defamatory statements.  The Complaint does not satisfy § 2333's second or third elements.

As to the second element, the publication of the Article is not, and is not alleged to be, a violation of any state or U.S. criminal law.  *See Hollander v. CBS News Inc*., No. 16 Civ. 6624, 2017 WL 1957485, at *1 (S.D.N.Y. May 10, 2017) (granting motion to dismiss where plaintiff alleged RICO violations against defendant news organizations based on their alleged "false and misleading" reporting of the 2016 U.S. presidential election), *vacated on other grounds sub nom. Hollander v Garrett*, 710 Fed. App'x 35 (2d Cir. 2018) (summary order); *see also United States v. Alvarez*, 567 U.S. 709, 734 (2012) (Breyer, J. and Kagan, J., concurring in the judgment) (explaining that statutes criminalizing the utterance of false statements must be narrow as "the threat of criminal prosecution for making a false statement can inhibit the speaker from making true statements, thereby 'chilling' a kind of speech that lies at the First Amendment's heart").

Even if a criminal action against a media outlet could be based on fraud, the Complaint does not allege that the allegedly life threatening statements in the Article are not true.  The Complaint alleges that Plaintiff received death threats primarily because of "Defendants' false accusations that he met with Mr. Sechin and Mr. Diveykin."  The Article does not say that Plaintiff *actually* met with the two Russians, but rather that U.S. officials had received *reports* of such meetings.  The substance and even headline of the Article express uncertainty about the occurrence and substance of any such meetings.  That some readers may have assumed that the meetings occurred does not constitute fraud by the Article's publisher.  The Complaint also does not dispute that "reports" were received, and instead confirms their existence; it describes the reports as "opposition political research by Christopher Steele . . . , a consultant hired by associates and or/or supporters of the Clinton Campaign."  The Complaint also alleges that the

Article created a "deceitful implication that the documents referred to were actual U.S. Government reports," but the Article merely states that "U.S. officials have . . . received intelligence reports . . . ."[1]

As to the third requirement for an act to constitute "international terrorism," the Complaint does not allege any facts that, if true, would show that the Article's publication was intended to intimidate or coerce the civilian population of the United States and foreign countries, or influence the policy of a government. The Complaint alleges these matters in an entirely conclusory manner. Even assuming without deciding that the publication of the Article "endangered human life" and "transcended national boundaries," the ATA claim fails as a matter of law.

### B. State Law Claims

In addition to the ATA claim, the remaining claims against Oath are state law claims of defamation and tortious interference with business relations. A district court may decline to exercise supplemental jurisdiction over claims arising under state law if the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In considering whether to exercise supplemental jurisdiction, courts must consider "[judicial] economy, convenience, fairness, and comity." *Jones v. Ford Motor Credit Co*., 358 F.3d 205, 214 (2d Cir. 2004). Considering these factors will usually lead to the dismissal of the non-federal claims

---

[1] The Court also notes that the Complaint alleges that non-parties Yahoo and HuffPost -- and not their corporate parent Oath -- published the allegedly defamatory articles. The Complaint alleges in a conclusory fashion that Oath is responsible for the publications of its corporate subsidiaries, but it does not allege any facts that, as a matter of law, would warrant piercing the corporate veil or otherwise holding Oath responsible for the actions of Yahoo and HuffPost. *See Balintulo v. Ford Motor Co.*, 796 F.3d 160, 168 (2d Cir. 2015) ("While courts occasionally 'pierce the corporate veil' and ignore a subsidiary's separate legal status, they will do so only in extraordinary circumstances . . . ."). For a claim to survive, it would have to be asserted against the party that committed the alleged wrong.

when the federal claims have been dismissed at a relatively early stage.  *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).  Here, the federal claim against Oath is dismissed on a Rule 12(b)(6) motion, while discovery is stayed pending the resolution of this motion.  It is therefore appropriate to decline to exercise supplemental jurisdiction.

### C.  Leave to Replead

Plaintiff requests, in the event of dismissal, leave to file an amended complaint.  Leave to amend should be freely given when justice so requires.  Fed. R. Civ. P. 15(a).  "However, where the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied."  *Hayden v. Cty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).  Leave to amend also may be denied where the plaintiff "fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in its complaint."  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).

The Court believes that any effort to replead a federal claim against Oath or its subsidiaries would be futile, meaning that an amended complaint could not cure all of the infirmities described above.  If Plaintiff believes otherwise, he may file a letter application (by sending it to the Pro Se Intake Office), not to exceed three, single-spaced pages, describing how he would amend the Complaint to state a federal claim against Oath or its subsidiaries.  Any such application for leave to replead shall be filed as provided below.

### IV.    CONCLUSION

The motion to dismiss the claims against Defendant Oath is GRANTED.  If Plaintiff seeks to file an amended complaint, he shall file a letter application as described above on or before **April 20, 2018**.  Pre-motion letters and a pre-motion conference are unnecessary.  The

Clerk of Court is directed to close the motion at Docket No. 20 and mail a copy of this Order to

pro se Plaintiff.

Dated: March 20, 2018
       New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**