I19KPAGC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CARTER PAGE,

                 Plaintiff,

            v.                          17 CV 6990 (LGS)

OATH, INC., et al.,

                 Defendants.

------------------------------x
                                        New York, N.Y.
                                        January 9, 2018
                                        6:00 p.m.

Before:

                    HON. LORNA G. SCHOFIELD,

                                        District Judge

                          APPEARANCES

CARTER PAGE, Pro Se Plaintiff

DAVIS WRIGHT TREMAINE LLP
     Attorneys for Defendant Oath, Inc.
BY:  JAMES E. ROSENFELD

GEOFFREY S. BERMAN,
     Interim United States Attorney for the
     Southern District of New York
STEPHEN S. CHA-KIM
     Assistant United States Attorney

I19KPAGC

```
 1              (Case called)

 2              MR. PAGE:  Carter Page, pro se.

 3              THE DEPUTY CLERK:  Thank you.

 4              Counsel?

 5              MR. ROSENFELD:  James Rosenfeld, Davis Wright

 6    Tremaine, for Oath.

 7              MR. CHA-KIM:  Stephen Cha-Kim, for the United States.

 8              THE COURT:  You may be seated.

 9              First of all, apologies for the matters that came

10    before you.  I'm trying to get through them as quickly as I

11    can.

12              We are here for an initial conference.

13              Mr. Page, I know you don't have the help of a lawyer,

14    so welcome.  I've read the joint letter and your proposed case

15    management plan, but it would be helpful to me if you just tell

16    me what the case is about.

17              So if you're comfortable doing that, Mr. Page, if you

18    would stand when you speak, and speak into the mic, and just

19    tell me briefly what the case is about.

20              MR. PAGE:  Yes, your Honor.

21              There were multiple false defamatory articles written

22    against me by subsidiaries of Oath, Inc., and they were

23    retransmitted by Broadcasting Board of Governors RFE, which is

24    the Radio Free Europe/Radio Liberty.  There was a major change

25    in the law in 2013, which allowed broadcasts in the United
```

I19KPAGC

```
 1   States.  And this was the first presidential election where

 2   that happened, and so these completely false allegations --

 3   totally misrepresenting who I am, what I am -- were on the

 4   broadcast all around the world, and became one of the largest

 5   stories over the last 14 months.

 6          THE COURT:  I don't want to dwell on it, but would you

 7   mind just giving me an idea of who you are, what your

 8   background is, and what the stories were about, so I have some

 9   flavor of what's going on?

10          MR. PAGE:  Yes, your Honor.

11          I am a -- I've been a professor, scholar for many

12   years.  I did my Ph.D. in the University of London.  I'm a

13   military veteran.  I worked in the Pentagon doing U.S.-Russia

14   arms control negotiations.  I've done a lot of different

15   things, both in the scholarly arena -- I was a professor at NYU

16   for over six years --

17          THE COURT:  In what field?

18          MR. PAGE:  In the Center for Global Affairs, so I've

19   taught about --

20          THE COURT:  International relations?

21          MR. PAGE:  Yes, yes.

22          THE COURT:  Okay.  Go ahead.

23          MR. PAGE:  But I also have run a small boutique energy

24   investment firm, and I've been working on that in parallel.

25          THE COURT:  Okay.
```

I19KPAGC

```
 1              And so these publications concern what subject?

 2              MR. PAGE:  Well, there were false allegations -- I

 3    gave a speech in Moscow in July 2016, and I was invited by a

 4    university and gave a speech there.  And it was totally

 5    misrepresented, and there was some opposition political

 6    research individuals.  It's the cover story of the New York

 7    Times today, the Fusion GPS, which was hired by the Democratic

 8    National Committee and some individuals, and they hired an

 9    opposition political research person to dig up some dirt, if

10    you will, on individuals.  And they got some false information

11    on me, which has been totally debunked over the last year and a

12    half.

13              And, very similar to U.S. versus Mulligan, I've been

14    dealing with a lot of the same things, where there was a real

15    flagrancy of conduct in terms of some of the -- that article

16    was pitched by Fusion GPS, which is the firm in today's

17    headlines in the New York Times, and they tried, similar to --

18    multiple fraudulent attempts, to give this information to the

19    same paper, New York Times, Washington Post, CNN, other

20    organizations.  And they ended up finding one group, which is

21    Yahoo News.

22              THE COURT:  What about Oath, the defendant,

23    Oath, Inc., what was their role in all of this?

24              MR. PAGE:  So, Oath was in the process of acquiring

25    Yahoo.  They announced the acquisition in the summer of 2016,
```

I19KPAGC

1    and they closed the acquisition last year.  They also own a --

2    through their AOL subsidiary, they own -- they've owned for

3    many years Huffington Post, and they put together a long list

4    of also defamatory articles about me as well.

5         THE COURT:  So what relief are you seeking?

6         MR. PAGE:  In my opinion, this may be the most

7    egregious defamation case ever, both in terms of falsity but

8    also impact.  Like for Mr. Mulligan, a moment ago -- you talked

9    about stresses on family -- this was a very stress, and my

10   family has been going through a tremendous amount of challenges

11   and hardship.  Especially given it's such a political issue,

12   this is not something that is just mentioned in your community

13   or you have a bad reputation; this is -- I'm sure tonight it

14   will be on all of the major news broadcasts.

15        THE COURT:  You think the story about you will be on

16   all the major news broadcasts?

17        MR. PAGE:  Not about me, but it all began with me.  So

18   this dossier -- tomorrow is the one-year anniversary of when

19   this document was put out to the world.  And the only person --

20   and about a dozen people, give or take, had allegations put

21   against them, including President Trump.  I was the only one

22   who was pinpointed and targeted before the election.  This was

23   in September of 2016, 45 days before the election.  So I really

24   became, if you will, de facto public enemy number one, based on

25   these completely false allegations.

I19KPAGC

| | |
|---|---|
| 1 | THE COURT:  Okay.  That's very helpful.  Thank you. |
| 2 | MR. PAGE:  Thank you. |
| 3 | THE COURT:  So let me hear first from Mr. Rosenfeld |
| 4 | about your client's position in all of this. |
| 5 | MR. ROSENFELD:  Thank you, your Honor.  I know it's |
| 6 | late, so I'll be brief. |
| 7 | So, yes, Oath is the product of Yahoo merging with |
| 8 | AOL.  AOL owns Huffington Post.  The first article we're |
| 9 | talking about, and the main one that's the subject of this |
| 10 | case, was a September 23, 2016, article in Yahoo News, and then |
| 11 | there was some follow-up, various other reports down the line |
| 12 | in the Huffington Post.  They all had to do, in one facet or |
| 13 | another, with Mr. Page's role in the story about connections |
| 14 | between the Trump Campaign and Russian officials, Russian |
| 15 | influence. |
| 16 | He and, I am sure, would tell you very different |
| 17 | accounts of that story; you hear very different accounts every |
| 18 | day from different news sources.  Our position is that all of |
| 19 | the reporting we did on his role was a hundred percent true, it |
| 20 | was substantially true.  Many of the statements that he focuses |
| 21 | on are not defamatory to begin with because there are other |
| 22 | legal defenses that apply, Section 230 of the Communications |
| 23 | Decency Act, the statute of limitations, which he admits bar |
| 24 | some of the claims, but -- |
| 25 | THE COURT:  I know you have a fully briefed motion to |

I19KPAGC

dismiss -- I have not looked at it yet -- but if truth is a big

defense, that doesn't sound like something that can be dealt

with on a motion to dismiss.

        Is your motion a partial motion or are you trying to

dismiss the entire complete?

        MR. ROSENFELD:  It's a complete motion to dismiss, and

I can explain why.

        THE COURT:  Okay.

        MR. ROSENFELD:  Some of the defenses are purely legal

arguments, like Section 230, statute of limitations, the issue

of whether certain statements do or don't have defamatory

meaning, whether some of them are opinion.  Those are all

things that can be cited as a matter of law.

        Mr. Page filed an enormous complaint, about 200 pages

of exhibits.  All of the things that we are saying are

substantially true, can be held substantially true, as a matter

of law, based on the pleadings, which incorporate those

exhibits.

        So, for instance, just to give one example, one of the

statements that he objects to, and claims is defamatory, is

that an article he wrote compares U.S. sanctions against Russia

to the killing of a -- police brutality against Michael Brown

and Eric Garner in the United States.  He says the article

didn't say that.  He attaches the article.  It's an exhibit to

the complaint.  And your Honor can read the article and make

I19KPAGC

1    that decision, based on the complaint and the documents

2    incorporated thereto.

3              THE COURT:  Okay.

4              Let me hear from the other defendant.

5              MR. CHA-KIM:  Good evening, your Honor.

6              So, from the government's perspective, as much

7    notoriety as there is about the dossier and Mr. Page's alleged

8    connections to Russia, it's really a simple matter of a

9    deficient complaint on a number of bases.

10             First, the defamation claims:  Mr. Page has sued the

11   wrong entity.  According to the terms of the complaint, the

12   company or entity that republished this HuffPost article, Radio

13   Free Europe, while a federal grantee -- it's an independent

14   corporation, so under Second Circuit precedent, it needs to be

15   sued in its own right.  The Broadcasting Board of Governors,

16   even though it funds it, can't be held responsible for RFE's

17   actions.  Even if it could be, defamation is a tort that is

18   specifically not included in the types of actions for which

19   there is a waiver of sovereign immunity.  The government can't

20   be sued for that type of tort.

21             Even if it could pass those two problems, Mr. Page has

22   not exhausted his administrative remedies as well, if your

23   Honor needed another reason to dismiss that claim.

24             As for the remaining claims, they're fairly

25   outlandish, and self-evidently so.  He alleges that the

I19KPAGC

1   government committed acts of terrorism against him and funded

2   acts of terrorism against him.

3          Aside from there being no plausible basis to assert

4   such a thing, terrorism and funding of terrorism is also not in

5   the list of torts for which there is a waiver of sovereign

6   immunity for which you can sue the government.

7          THE COURT:  Okay.  I know that that will be fully

8   briefed at the end of this month, so it sounds like there is a

9   schedule in place.

10          So, first, let me ask:  Has there been any

11   consideration of trying to resolve this outside of litigation

12   and trying to settle the matter?  Let me ask Mr. Page first.

13          MR. PAGE:  Your Honor, according to your rulings, we

14   had an exchange of three-page letters and initial thoughts --

15          THE COURT:  Yes.

16          MR. PAGE:  -- many months ago.  And, frankly speaking,

17   each of those points that Mr. Cha-Kim just alluded to I

18   addressed in my letter.  And, unfortunately, those open issues

19   were not integrated into his motion or the government's

20   motion --

21          THE COURT:  Just time out.  I will need to read your

22   papers, both papers, and I'm not prejudging anything right now.

23          MR. PAGE:  Yes.

24          THE COURT:  My only question is:  Have you and the

25   defendants made any efforts to settle the case, in other words,

I19KPAGC

```
 1        just resolve it without furthering the litigation?
 2              MR. PAGE:  Your Honor, there is, in both of the
 3        motions to dismiss, from each of the defendants, there was a
 4        lack of recognition of the main elements that I was alleging
 5        and which increasingly -- over the course, since I filed my,
 6        case, four months ago almost, a steady stream of information
 7        has come out, which have only further strengthened my argument.
 8        And there are also a number of --
 9              THE COURT:  So does that mean you're not interested in
10        settlement discussions?
11              MR. PAGE:  I am interested, but I think, based on the
12        information that I've received thus far and the response and
13        the fact that I wrote a pretty extensive, well thought out,
14        both from a factual standpoint but also from a legal
15        standpoint, initial three-page letter many months ago, the fact
16        that they're not considered --
17              THE COURT:  Well, just so you understand, the point of
18        the letters, the exchange of letters, is that if there is some
19        deficiency that they identify, that you acknowledge and can
20        correct, it gives you an opportunity to do that without filing
21        motions.
22              MR. PAGE:  Yes.
23              THE COURT:  But, frankly, that is fairly rare, as you
24        might imagine, and so the parties continue to have their
25        differences.  And so they essentially just bring them to the
```

I19KPAGC

1    Court; they don't acknowledge the arguments that were in the

2    letters.  They sometimes preview them, but I wouldn't take

3    offense that they didn't do anything with your arguments,

4    because what they've simply done is brought them in front of

5    me.

6              MR. PAGE:  Yes, yes, your Honor.

7              Well, I think, in parallel, there are a number of

8    other cases ongoing in other U.S. district courts, both in the

9    District of Columbia as well as the Southern District of

10   Florida, which are related to that, what I call the dodgy

11   dossier, which was premiered on January 10th, which attacked --

12   there were many allegations against many individuals.  I was

13   the only one pinpointed, and the level of falsity and the

14   egregiousness of the offenses were much more definitive then.

15   And, again, there has been -- in terms of discovery and

16   evidence, I'm not a legal expert by any stretch of the

17   imagination, but there has been a tremendous amount of -- I

18   would find it hard to think of another case where there has

19   been such a level of discovery --

20             THE COURT:  So where do you stand on settlement

21   discussions?  Is it worth my referring to this to Judge Moses

22   to see if she can help you and the defendants try to resolve

23   this, or would that be a waste of time, in which case I won't

24   waste your time or anybody else's?

25             MR. PAGE:  Again, I'm new to this.  Listening to U.S.

I19KPAGC

1    versus Mulligan, that was the longest I've ever sat in a

2    courtroom, so I would defer to your judgment, your Honor.

3        THE COURT:  Okay.  Let me hear from the defendants on

4    that question.

5        MR. ROSENFELD:  I don't think that mediation of this

6    case is going to be productive.  We have fundamental

7    disagreements about the facts and fundamental disagreements

8    about the law, and I really don't see a middle ground.

9        THE COURT:  Okay.

10       Tell me what the discovery looks like in this case,

11   from your client.

12       MR. ROSENFELD:  We would want to take a written

13   discovery and deposition of Mr. Page certainly.

14       THE COURT:  Exploring what kinds of issues?

15       MR. ROSENFELD:  There are a lot of factual issues --

16   there are many statements that he's alleged are defamatory and

17   raises a host of factual issues.  They have to do --

18       THE COURT:  So getting at the factual issues that are

19   allegedly defamatory?

20       MR. ROSENFELD:  Sure.  His role, who he met with in

21   Russia.  The main thrust of the first article has to do with

22   his meetings with two Russian officials.  He's taken issue with

23   a number of things about that story.  We have to ask a lot

24   about the meetings in Russia, his other dealings in Russia, his

25   ownership of shares of the largest oil company, the former

I19KPAGC

1    ownership of shares in the largest oil company --

2           THE COURT:  I'm going to interrupt for a second.  What

3    kind of discovery do you have to provide to Mr. Page?  I

4    understand you don't have a discovery request yet, but there

5    are always obvious documents that one expects to provide and

6    that you have told your clients to preserve and that you

7    perhaps have already reviewed.  What's the nature of that?

8           MR. ROSENFELD:  Well, we told our clients to

9    preserve -- we've done a full litigation hold on everything

10   having to do with -- there's a lot of articles here.  They're

11   preserving notes, interviews, drafts, we will almost

12   certainly -- I think there's a good chance we will have orders

13   of privilege issues about what is discoverable and what's not,

14   but all of that's been saved.  I have no doubt we'll want to

15   talk to folks that wrote the articles and ask them about their

16   reporting and the basis for their stories.

17          THE COURT:  Okay.  So here's what I'm going to do:  I

18   obviously will await the second motion.  I will decide the

19   motions.

20          I should just explain, especially explain to Mr. Page:

21   I have over 200 cases.  I have pending motions in many of them.

22   I get to them as I get to them.  So I can't promise you it will

23   be tomorrow, because it won't, and so I'll try and get to it as

24   quickly as I can.

25          In the meantime, I'm going to stay discovery

I19KPAGC

1    concerning Broadcasting Board of Governors because it sounds to

2    me that at least the sovereign immunity defenses may prevail.

3    Maybe I'm wrong, but I'm going to stay just that discovery as

4    to that defendant, so no discovery as to Broadcasting Board of

5    Governors yet.  If I deny the motion, there will be full

6    discovery.

7            And then regarding Oath, Inc., I will allow document

8    requests but no other type of discovery yet, so no

9    interrogatories, no depositions yet.  Let's wait until I decide

10   the motions to dismiss, but you should go ahead with your

11   exchange of document requests and begin the process of

12   producing documents.

13           MR. ROSENFELD:  Your Honor, may I speak to that for a

14   moment?

15           THE COURT:  Yes.

16           MR. ROSENFELD:  Our position -- and we haven't had a

17   chance to address this yet, we mentioned we were going to, to

18   talk about it in our joint letter, the defendants' joint

19   letter.

20           THE COURT:  I know you want a stay of discovery, but

21   it seems to me that, given that I can't get to your motion to

22   dismiss immediately, and I virtually never allow stays of

23   discovery while motions are pending except when I'm statutorily

24   required to do that, and so I am going to allow some exchange

25   of documents.

I19KPAGC

1          MR. ROSENFELD:  Okay.  Thank you, your Honor.

2          THE COURT:  Okay.

3          MR. PAGE:  Your Honor, if I may just add one quick

4    point with regards to --

5          THE COURT:  Yes.

6          MR. PAGE:  Because I just jumped over the

7    U.S. Government element with the sovereign immunity issue.

8          There is an exception in the sovereign immunity

9    statute, which gives an exception if there's an instance of

10   abuse of process.  A lot of this information which is

11   another -- this is the latest big headline in the New York

12   Times and on the major news stations right now, a lot of false

13   evidence related to these same false allegations from

14   Mr. Steele, who is the person who put together this dodgy

15   dossier and that was used allegedly for getting a FISA warrant

16   against me, which is a completely outrageous element, and there

17   has been a tremendous amount of controversy, and there is a --

18   just within the last few days -- it was alluded to in a quick

19   footnote in the letter -- there was a the Chairman of the House

20   Intelligence Committee has had an agreement with the deputy

21   Attorney General -- the U.S. Department of Justice has been

22   under a tremendous pressure to provide this information related

23   to the alleged FISA warrant against me and the big questions

24   that are outstanding, particularly as it relates to Mr. Steele.

25          And in parallel with that, a brief final point:  The

I19KPAGC

1  chairman of Senate Judiciary Committee sent a letter actually

2  referring that individual, Mr. Steele, for consideration and

3  investigation for potential violations of 18, U.S.C., 1001.  So

4  he is under various questions right now.  And it was also

5  cosigned by the chairman of the Senate Judiciary Subcommittee

6  On Crime and Terrorism.

7          Final quick point:  The terrorism element, the Senate

8  Judiciary Committee, just in the last few hours, released a

9  transcript.  And one of the lawyers for Fusion GPS, which is

10  involved in this, a quote from him says:  "Somebody has already

11  been killed as a result of the publication of this dossier."

12  That was one of the main headlines today, and I'm sure it will

13  be on the news tonight.  So I had a number of death threats

14  related to these false allegations, which were transmitted

15  worldwide, and so I think it's far from frivolous.

16          Thank you.

17          THE COURT:  Okay.  Thank you.  I look forward to

18  looking at both sides' papers.

19          I'll enter an order.  Please pay attention to the

20  order.

21          I don't think there's anything else we need to address

22  right now.  So we're adjourned.

23          MR. CHA-KIM:  Thank you, your Honor.

24          MR. ROSENFELD:  Thank you, your Honor.

25                              *  *  *